WILL OF SCHAEFER: SCHAEFER, Appellant, vs. ZIEBELL and another, Respondents.

*February 11—March 8, 1932.*

The cause was submitted for the appellant on the brief of *Brennan, Lucas & McDonough* of Milwaukee, and for the respondents on that of *L. D. Potter* of Racine, attorney for Clara Wright, and by *Sullivan & Taugher* of Milwaukee, attorney for Robert Ziebell.

NELSON, J.   In reaching the conclusion just mentioned, the court, it seems to us, was dominated by equitable rather than legal considerations.   That a will does not divide an estate equitably among those who are the natural objects of the testator's bounty is not of controlling importance in determining the question of undue influence.   Such a will is not to be considered in the light of what the court, in a particular case, deems just or unjust, but rather in the light of what the testator really desired.   If a will expresses the

desires and wishes of the testator and was properly executed by one having testamentary capacity and is not the result of undue influence, it is the imperative duty of the courts to give such will effect and to carry out its provisions no matter how strongly a different distribution might appeal to the court. The vital question always is:

"Was the will such a one as the testator wanted to make? His reasons for so making it may be good or bad, or there may be no reasons whatsoever for the making of it. If it is clearly apparent that it was in fact his will, it is immaterial what reasons he had for the making of the will in the manner in which it is made. He is entitled to have his will carried out according to its directions." *Will of Lotwin,* 186 Wis. 42, 49, 202 N. W. 151.

In view of the numerous and well considered cases found in our Reports involving undue influence, it may be wholly unnecessary to review the established and governing law. However, a brief review of the law as to undue influence in connection with the facts of this case may tend to make more clear the views of the court expressed herein.

One of the most important rights that a person of full age, mature mind, and disposing memory enjoys is the absolute right to dispose of his property by will as he may choose. *Vance v. Davis,* 118 Wis. 548, 95 N. W. 939; *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8.

It is of course elementary that this right to make a will must be exercised when the testator has testamentary capacity and when he is not subjected to undue influence. The general characteristics of undue influence are stated by Mr. Justice MARSHALL, speaking for the court, in *Ball v. Boston, supra,* as follows:

"The actor is treated as a wrongdoer—one bent upon a reprehensible purpose; the other as his unwilling or unsuspecting, in any event under the circumstances, powerless victim of the purpose effected by 'that subtle species of fraud'—where such helplessness to resist direct or indirect

suggestion is produced by 'insidious approaches, seductive artifices, or other species of circumvention.' Undue influence is the very antithesis of right influence. It exists only where there is practical destruction of voluntary volition,— at least, is moral coercion for an ulterior purpose."

Undue influence should not be confused with that highly proper influence which results naturally from kindnesses done, or love and affection bestowed, which rightly and naturally give rise to feelings of esteem and gratitude. *Ball v. Boston, supra*. As was said in *Mackall v. Mackall*, 135 U. S. 167, 172, 10 Sup. Ct. 705:

" 'Influence gained by kindness and affection will not be regarded as 'undue' if no imposition or fraud be practiced, even though it induce the testator to make an unequal and unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. . . . It would be a great reproach to the law if, in its jealous watchfulness over the freedom of testamentary disposition, it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them."

In this state undue influence is considered as a species of fraud and must be established by clear, convincing, and satisfactory evidence. *Ball v. Boston, supra; Duncan v. Metcalf,* 154 Wis. 39, 141 N. W. 1002; *Will of Skrinsrud,* 158 Wis. 142, 147 N. W. 370; *Will of Boardman,* 178 Wis. 517, 190 N. W. 355; *Will of Shaver,* 187 Wis. 647, 205 N. W. 320; *Will of Fortner,* 188 Wis. 594, 206 N. W. 969.

"Undue influence 'cannot be presumed from conjecture or suspicion without reasonable and satisfactory proof of facts establishing the contrivance and undue influence.' " *Will of Wallace,* 197 Wis. 323, 326, 222 N. W. 255.

The four elements necessary to be proved in order to establish undue influence are as follows: (1) A person un-

questionably subject to undue influence, (2) opportunity to exercise such influence and effect the wrongful purpose, (3) a disposition to influence unduly for the purpose of procuring an improper favor, and (4) a result clearly appearing to be the effect of the supposed influence. *Ball v. Boston, supra; Will of Nachtsheim,* 166 Wis. 556, 164 N. W. 997; *Will of Bocker,* 167 Wis. 100, 166 N. W. 660.

Since the court found that undue influence had been exercised and since findings of trial courts are not ordinarily disturbed on appeal unless they are against the great weight and clear preponderance of the evidence, a consideration of the evidence in connection with the elements constituting undue influence seems advisable.

(1) Was deceased, on the 13th day of April, 1928, unquestionably susceptible to undue influence?

While she was, at that time, about eighty-eight years of age, she was neither insane, feeble-minded, nor in an advanced stage of senile dementia. She was, to be sure, feeble and infirm, slightly stooped in posture, somewhat deaf, and partially blind so as to be unable to read without glasses. She seems, however, to have been in the possession of her mental faculties and undoubtedly knew what she herself wanted, with whom she preferred to live, and what she wished to do with her property. The evidence reveals that she was able to stand her ground and to insist on her wishes being respected. On March 26th, a little more than two weeks before the will was made, when the Wrights removed to their new home she was importuned to accompany them, but refused to do so. She manifested on this occasion rather unusual strength of character and refused to yield to the wishes of the Wrights. She wished to live with George and did not care to reside with the Wrights where he could not be. This desire to live with George did not suddenly arise as a result of anything that happened on the day in question. As early as December, 1927, she had given

expression to her desires and of her intention to reside with George, of whom she seemed to be most fond. This testimony was given by some of the disinterested relatives who testified on behalf of the contestants. Her desire to live with George was expressed even before George had been turned out of the Wright home and persisted right down to the time the Wrights moved. In addition to these circumstances it also appears that shortly before the Wrights removed from their home they fully realized that deceased desired to leave their home and to take up her residence with George. In this situation the Wrights attempted to get deceased to pay over to them the sum of $2,000, which, together with the sum of $500 theretofore advanced to Mrs. Wright, would be regarded by them as satisfactory compensation for the board and keep theretofore furnished to her by them. She, however, refused to yield to such demands even though they were rather insistently pressed. This incident also revealed considerable strength of mind which militates against the conclusion of the court below that she could be either improperly led or forced to do something against her will. It is quite apparent that the refusal of deceased to remove with the Wrights to their new home gave rise to no questions in their minds as to the mental condition or capacity of deceased. It seems to have been rather taken for granted as a foregone conclusion that deceased, due to her deep affection for George, preferred to live with him. In any event no steps were taken by the Wrights to have her placed under guardianship although she then possessed funds deposited in a bank aggregating the sum of at least $7,100. When, about two weeks after deceased's departure, the Wrights started an action against her to recover what they claimed was due them for the services theretofore rendered her, no thought seems to have existed in their minds that it was necessary to have a guardian *ad litem* appointed for her. These facts are not with-

out significance and have a bearing upon what they thought of her mental condition at about the time the will was drawn. The day after deceased was sued by her daughter and son-in-law and all of her money tied up by garnishment, she made her will. It was drawn in an attorney's office and by an attorney. All of the information necessary to the drafting of the will was given to the attorney by deceased, apparently without prompting. The will was dictated in her presence, and when completed was read over to her and fully explained to her. The testimony of the attorney who drew the will and of the three subscribing witnesses, one of whom was another attorney and two of whom were also friends of the Wrights, that in their opinion the deceased, at the time of executing the will, was competent, had testamentary capacity, and was under no restraint or apparent undue influence, may not be lightly brushed aside or permitted to be outweighed by circumstances which give rise merely to suspicions. A careful review of the entire record impels the conclusion that the deceased, at the time she made the will, was not unquestionably susceptible to undue influence and that the conclusion of the trial court to the contrary is not sufficiently supported by the evidence.

(2) Was there an opportunity to exercise undue influence?

It may be stated that such opportunity did exist. At the time the will was drawn deceased was living with the Coles, and almost every day between the 26th of March and the 13th of April George called upon her and visited with her. It therefore appears that George had an opportunity to exercise undue influence upon his mother to make a will in his favor.

(3) Was there a disposition on the part of George, clearly and satisfactorily shown, to exercise undue influence upon his mother to make a will improperly favoring him?

The record is quite devoid of any actual evidence, either direct or circumstantial, bearing upon this issue. "Disposi-

tion" in the sense it is here used means something more than a mere willingness by one to share to a greater extent than another in the distribution of a parent's estate. It implies a willingness on the part of a person to do something wrong or unfair, to bring about a result favorable to himself and unjust to another, and grasping or over-reaching characteristics. There is nothing in the record tending to show that George was so disposed or so constituted. The record, however, is replete with testimony to the effect that George was always kind and good to his mother; that she was very fond of him, had a deep and abiding affection for him, considered him her best friend, and reposed great confidence in him. That his welfare was uppermost in her mind and that she was most happy when in his presence, appears without question or doubt. It should never be held that a long course of kindly treatment of a parent by a child should, in and of itself, be a basis for supporting the charge of a wicked intent or disposition to exercise undue influence. There is nothing in the record tending to show that even after George was put out of the Wright home he felt any animosity toward the Wrights or was imbued with feelings of revenge, nor is there anything in the record showing any suggestion of any ill will existing between him and his nephew, Robert Ziebell. The simple fact that, under all the circumstances, the will greatly favored George is of little significance and falls far short of proving a disposition on his part to exercise undue influence as hereinbefore defined.

(4) Was there a result clearly appearing to be the effect of the supposed undue influence?

The trial court concluded that the will was unnatural in that no mention was made of Robert Ziebell. Under all of the circumstances we cannot so regard it. There is no evidence justifying the conclusion that any particular affection ever existed between the deceased and her grandson, Robert. Although the latter and his wife called on the

deceased two or three times after the will was drawn, the evidence is undisputed that during the four years prior to that time they had never called upon her or manifested any particular interest in her. It is undisputed that, during the entire period covered by the testimony, the deceased not only expressed no affection for him but never mentioned him at all, except to Mrs. Ziebell. It clearly appears that Robert at no time, during the last four or five years of her life, which was the period particularly covered by the evidence, occupied any particular place in her affection.

*By the Court.*—Order reversed, with directions to admit the will to probate.