Estate of Scherrer: Manion, Executor, and another, Appellants, vs. Hunt and another, Respondents.

*December 9, 1942—February 9, 1943.*

212

*Walter D. Corrigan, Sr., Thomas M. Corrigan, Miller, Mack & Fairchild,* and *Richard F. Mooney,* all of Milwaukee, for the appellants.

*Leo J. Landry,* attorney, and *Eugene Wengert* of counsel, both of Milwaukee, for the respondents.

MARTIN, J.   Isabel Scherrer died October 12, 1940, at the age of fifty-six.   She had never married and had lived at the home of her parents in the city of Milwaukee from childhood. Her father died in 1928.   After his death she, her widowed mother, and a bachelor brother continued to live in the family home.   The mother died at the age of eighty-seven, a few months after testatrix.   The brother has since died.   Testatrix left school at about the age of sixteen, and learned the millinery trade.   She continued in that business until she retired in 1931.   Her business activities were very successful and she had accumulated an estate estimated at between $40,000 and $50,000.   Her estate is now appraised at $35,364.44.   She was regarded by her relatives, friends, and business associates as an intelligent, capable, and successful business woman.

In December, 1923, she met Harry L. Manion.   She was then forty and he was fifty-nine years old.   They later became engaged and kept company until the time of her death.

Manion had been divorced before he met testatrix. They never married because she had been reared in the Catholic faith and her mother, who was a devout Catholic, opposed her marriage to a divorced man.

About two years before her death, testatrix became ill. Her illness was characterized by loss of weight, pain in the rectum, particularly during bowel movements, nervousness, and inability to sleep. She took sedatives to enable her to sleep and to overcome her pain. These sedatives were barbiturates, dispensed under the proprietary names of seconal, veronal, and sodium amytal. In August, 1939, she consulted Dr. W. J. Carson, who specialized in surgery. She then complained of pain in the rectum, constipation, and inability to sleep. She informed Dr. Carson that she was taking medicine at times at night, and also cascara. Upon his examination, he advised hospitalization. Three days later she entered Columbia Hospital in Milwaukee. X rays of the bowels and an examination disclosed that she suffered from internal and external hemorrhoids, two fissures, a stricture of the rectum, and dilation of the large bowel. An operation was performed and after nine or ten days in the hospital she returned to her home.

Some months prior to her operation she was at the Foss Sanitarium in Wauwatosa, where she stayed only a week. While there she appeared nervous and upset. She worried about her bowel trouble. A couple of weeks later she went to Shorewood Sanitarium and stayed there a week. On May 29, 1939, she went to St. Joseph's Hospital. An X ray was taken. She complained that she did not sleep, and, at her insistence, she was given two seconal tablets at night, and she was able to sleep.

During her illness it was usual for testatrix to take sedatives upon retiring to relieve her pain and induce sleep. At times she took excessive amounts. Testatrix generally arose in the morning between 10 and 11 o'clock. Frequently she

appeared dopey and staggered like an intoxicated person, at times requiring assistance in dressing and eating her breakfast. At times her speech was thick and hesitant and she was unable to carry on a connected conversation with those in the household. She would brighten up as the day wore on. She would read in the afternoon and at times would discuss with her mother things she had read about. She frequently discussed with her mother her investments and mentioned by name certain of them, which are now listed in the inventory of her estate.

Dr. A. W. Ladewig, who was the Scherrer family physician and attended testatrix in her lifetime, testified in behalf of contestants in substance as follows: That he had been going to the Scherrer home for a couple of months before Isabel's death, sometimes every night or once or twice a week, and generally between midnight and 2 o'clock in the morning; that he could not have much conversation with her because she was generally half asleep; that at times he gave her hypodermic injections of hyoscine, which is a nerve sedative and quiets the nerves, especially those in the brain; that it quiets the brain centers and functions and the patient goes to sleep; that he would give her one hundredth of a grain, which would last two or three hours; that he saw other sedative drugs at her home and told her more than once that if she took more of them she would die; that at times he found testatrix in confusion and under the influence of medicine, on which occasions she could not talk very plainly, her responses were like a person about half asleep; that he was called to the Scherrer home frequently at night during the period from July 16, 1940, to the date of her death; that during this period her mental operations were not as clear as they were years ago.

He testified that testatrix called at his office during the last six months prior to her death, during which times he observed her; that on such occasions he thought she had sufficient mental capacity to know what her property was, to know who

her relatives were, and to know what she was doing; but that at times when he was called to her home at night he did not think her mind was such that she could form a rational judgment, because she was doped up and half asleep. Dr. Ladewig issued the death certificate, in which he gave the immediate cause of death as acute gastroenteritis and chronic myocarditis.

The evidence in behalf of contestants discloses many occasions during a year or more prior to testatrix's death when she was in such mental condition that she could not make a valid will, but the precise questions here are: (1) Whether deceased on June 29, 1940, had sufficient mental capacity to make the will in question, and (2) whether the execution of said will was procured by undue influence exercised over and upon her. On both issues contestants have the burden of proof by clear, convincing, and satisfactory evidence. *Will of Schaefer,* 207 Wis. 404, 411, 241 N. W. 382; *Will of Grosse,* 208 Wis. 473, 476, 243 N. W. 465; *Estate of Sawall,* 240 Wis. 265, 3 N. W. (2d) 373.

George A. Affeldt, the attorney who drew the will of June 29, 1940, testified to three conferences which he had with testatrix in connection with making her will. He testified in substance as follows: That on June 26, 1940, he received a telephone call from a lady who introduced herself over the telephone as Isabel Scherrer; that she asked him for an appointment in reference to drafting a will; that he told her to come to his office that afternoon at about 2 o'clock, which she did; that he had not known her prior to that time; that she came to his office alone and was there about an hour and a half; that she had a will which she had signed on some previous occasion and had some notes; that she wanted to make some changes in the previous will, and that he made some notes as he discussed the matter with her; that he had a free discussion with her without reference to the previous will; that she told him what provisions she wanted in the will he was to prepare; that they talked about the amount of her estate and what it con-

sisted of. This first conference at Mr. Affeldt's office was on Wednesday afternoon, June 26, 1940. Referring to that conference, Mr. Affeldt testified:

"During my discussion on Wednesday afternoon I didn't observe anything unusual about the manner of her speech. It was an ordinary discussion that you would have with a client. I observed no hesitation about her at all about what provisions she desired to have inserted in her will. She talked fluently and didn't hesitate in telling me what she wanted in her will. I asked her how old she was and she said she was fifty-six. I had no impression from observing her that she was much older than fifty-six."

He testified that testatrix in discussing the provisions she wanted in her will referred to Mr. Manion as her fiance, and that she wanted him named as coexecutor with the First Wisconsin Trust Company; that on Wednesday he told her he would have a rough draft of the will ready the next day; that she called at his office on Thursday morning; that he read the draft of the will to her and they discussed its provisions paragraph by paragraph; that as they discussed the different provisions she made certain suggestions and corrections; that he made pencil notations as a result of their discussions back and forth; that during the discussions he observed no particular hesitancy in her speech or her mental operations.

According to Mr. Affeldt's notes and his first draft of the will, there were twenty specific bequests. Mr. Affeldt testified that his recollection was that testatrix had with her a previous will but he did not observe that she was referring to it at the time she told him what she wanted done; that she sat across his desk during the conference; that she was looking at him and he at her during the conversation; that she gave him the spelling of the names of some of the relatives; that he observed no difficulty of any kind about the spelling of the names.

After the Thursday conference Mr. Affeldt informed testatrix that he would be out of the city on Friday and that she should come to his office on Saturday morning, which she did

at about 10 o'clock; that when she called on Saturday morning the typing of the will was not completed; that as the pages were typed he gave her one copy and read the other himself; that as he read the will he discovered the residuary clause had been omitted in error; that when they discussed the drawing of the will on Wednesday Manion's name had been mentioned as the residuary legatee; that in the Thursday conference testatrix stated that she wanted the residue of her estate to go to the Milwaukee Community Fund; that because of the omission of a residuary clause the will, or that part of it providing a residuary clause, was rewritten during the conference; that when the drafting of the will was finally completed, and before the pages were clipped together, Mr. Affeldt read the will aloud; that testatrix had a copy before her as he read; that when he finished reading the will Mr. Affeldt asked her whether it was now in the shape that she wanted it; that she said it was; that Mr. Affeldt then called in Mr. Dede, the other witness to the will, and introduced him to Miss Scherrer; that in the presence of Mr. Affeldt and Mr. Dede, testatrix stated that the will was drafted as she wanted it; that she then signed it in the presence of Mr. Affeldt and Mr. Dede, they both signed as witnesses in her presence and in the presence of each other; that testatrix declared it to be her last will and testament. Mr. Affeldt testified that on Saturday morning testatrix looked the same as she did on Wednesday and Thursday; that he observed no mental agitation or physical fidgeting at any time during his conferences with testatrix; that from his observation he would say that there was not any question that testatrix understood the provisions of her will.

Attorney John C. Fellenz testified that he drafted several wills for testatrix between February 14, 1939, and May 25, 1940; that she first called at his office on February 14, 1939; that she gave him all the necessary data concerning the provisions that she wanted in her will; that the will he prepared

was executed on February 15th; that thereafter she called at his office on several occasions to have changes made in certain bequests, which necessitated a redrafting of the will; that the last will he drafted for testatrix was on May 25, 1940; that in the several wills which he drafted Mr. Manion was named as one of the legatees; that the bequest to testatrix's mother and the provisions in the trust for the mother and brother were the same in the several wills. Mr. Fellenz testified that on March 14, 1940, he prepared both the federal and state income tax returns for testatrix; that she furnished him all the necessary information for the income tax returns. He testified:

"I conversed with her considerably on that day. Her mentality was good. I could talk intelligently with her. The items in the income tax return consisted, I think, of twelve items of dividends she had received, five or six items of interest, and the rental. She stated all of those to me in detail. She did not hesitate or have any difficulty whatever in giving me directions in that behalf. Deductions were taken. She gave me directions in respect to the deductions. . . . She had all her figures, and she had the amount paid for taxes. She even deducted the depreciation. She informed me of the original cost of the building, and I deducted her depreciation. She had all those figures, she gave me anything I asked for. . . . I think she brought in some of the coupons which had not been paid and inquired whether or not she could make any deductions for those that were not paid."

He testified that testatrix impressed him as being perfectly normal, always knew and did things in a very businesslike manner, and always knew exactly what she was doing; that he noticed no change in her mental attitude or condition between February, 1939, and May, 1940; that in conversation with him, testatrix referred to Mr. Manion as her fiance.

Dr. R. J. Mashek testified that testatrix called at his office in October, 1939, for dental services; that at that time he made an upper and lower denture for her; that he saw her about ten

times over a period of six weeks; that she called at his office for treatment on July 16, 1940, and on two occasions later. He testified:

"I conversed with her when she was at my office in July, 1940. The conversations were regarding her teeth, how she felt and the topics of the day. Her conversations were very clear; they were connected, and I was able to understand them very well. There was at no time any confusion in her conversation. This is also true in regard to conversations I had with her in 1939. . . . In July, 1940, her speech was very normal. . . . Her speech was coherent; it was not thick. The first time she came in July, 1940, was about 10 o'clock in the morning. I asked her to come back in about two days. . . . She was in my office about a half an hour on each of the three times in July, 1940. In 1939 she was at my office as long as two hours at a time while she was having the dentures fitted. I never noticed any nervousness or fidgeting on her part. . . . She wasn't nervous. She would usually make appointments with me when she came to my office. She always kept the appointments promptly and came in at the appointed time."

Hugo Porth and Walter J. Gerbing both testified concerning business transactions with testatrix over a period of years. Mr. Porth testified that he knew that testatrix had money to invest and he sold her a number of investments; that his business relations covered the period from 1931 until testatrix's death, and through the months of February, March, and April of 1940. He testified:

"Her conversation was clear. It was connected, and I was able to understand it. When she was in my office in 1939, prior to her being ill, there certainly wasn't any hesitancy in her speech. I noticed no hesitancy or thickness over the telephone in her conversations with me. In April, 1940, she decided to sell the property. She fixed a price at which it should be sold. . . . She signed a listing contract, and I then turned her over to Mr. Gerbing who was in charge of our real-estate department. A sale was made. It was handled by Mr. Gerbing, except that I had several conversations over the tele-

phone with Miss Scherrer in which she wanted to know whether I thought she should accept the proposition. Those conversations were in August, 1940. I knew, of course, that she was ill and there was probably a slowness of speech at that time, but the conversations were entirely normal."

Mr. Gerbing testified to business transactions he had with testatrix concerning the sale of some properties. His transactions with her were as late as October 1, 1940,—eleven days before her death and several months after she executed the will in question. His last transaction with her involved closing the sale of some real estate and the execution of the deed to the purchaser. Mr. Gerbing testified that on that occasion (October 1, 1940) he was at her home twenty or thirty minutes; that her conversation at that time was the same as it was previously so far as he could see; that it was clear and coherent; that she spoke in connected sentences.

Joseph Scherrer, a brother of testatrix, testified that his sister, Isabel, began to show signs of failing health in 1939; that thereafter she was not in the same mood she used to be; that she was more solemn, more downhearted and moody; that during the last year or two she did not do much of anything; that she gave orders to the maid what to do and what to buy; that continued up to her death; that every week he would get tablets for her at the drugstore,—seconals, veronals, and sodium amytals; that during the last year and a half or two years before her death she took them practically every night; that at times when she got up she was like an intoxicated man; that on three or four occasions, about a year before his sister's death, he found her lying on the floor and she could not talk.

We think it not helpful to further discuss the testimony of the lay witnesses. We have said that the evidence discloses times and occasions when the testatrix's mental condition was such that she could not make a valid will. There is no denial of the fact that for sometime prior to her death testatrix had the drug habit. She took overdoses. While the effect of the

drugs lasted, the testimony shows that she appeared dopey and acted like a drunken person. During these spells she could not carry on a connected conversation. But there is little, if any, dispute of the fact that when the effect of the drugs wore off she was able to converse intelligently, read the newspapers, discuss topics of the day, and would usually in the afternoons go out with her fiance, transact business at the bank, and give orders to the maid what to do and what to buy for the household. That continued to her death.

Now, turning to the expert testimony in behalf of contestants, it is of little assistance to the court. It is based on hypothetical questions which omit important, undisputed facts,—for example, practically all of the facts testified to by Attorney Affeldt, who drafted the will in question; and many of the facts testified to by Attorney Fellenz, who drafted several wills for the testatrix and who, in March, 1940, made out the testatrix's federal and state income tax reports; likewise, omitting entirely from the hypothetical question the uncontradicted testimony of Hugo Porth, Walter J. Gerbing, Dr. R. J. Mashek, and Dr. W. J. Carson. Finally, in response to such hypothetical question, Dr. Enzer said he had an opinion, and answered the question as follows:

"I have an opinion. The only way I could express it would be to say this, that if I were asked as a physician to see such a patient, to determine whether they were fit to carry out such a procedure [make a will], I would say that they were not fit to do so *until I was satisfied they were at least out of the influence of the barbiturates, regardless of any other factors and conditions.*"

The other expert who testified in behalf of contestants, Dr. Andrew I. Rosenberger, said:

"I was in the courtroom today. I heard you [contestants' counsel] propound the hypothetical question to the previous witness, Dr. Enzer. I have in mind that question at this time and the facts therein stated. I have read Exhibit 1 [the will].

I have an opinion as to the mental condition of that person on June 29, 1940, to a reasonable certainty. *She was mentally sick at the time."*

He was then asked:

"*Q*. And having in mind the facts stated in this question, have you an opinion as to whether or not she was competent to hold in mind the facts referred to in this will, Exhibit 1, sufficient active memory to collect in her mind and comprehend without prompting the conditions of her property, her relations to her mother, her brother, to her friends, to various charities, to her fiance, other persons who might be the beneficiaries under her will and to hold these things in her mind a sufficient length of time so she might preserve the obvious relations to each other and to her property and to form a rational judgment in relation to that? *A*. I have an opinion. She was not competent to do so."

Since the hypothetical question which Dr. Rosenberger was asked to answer was the same as the question propounded to Dr. Enzer, there is omitted from consideration the testimony of Attorneys Affeldt and Fellenz, Drs. Mashek and Carson, and the testimony of Mr. Porth and Mr. Gerbing; all of which should have been weighed and considered in answering the hypothetical question. It is fundamental that a hypothetical question to a witness must include all the facts necessary to be considered in arriving at a correct answer. *Hoffman v. Regling,* 217 Wis. 66, 71, 258 N. W. 347.

On the other hand, the hypothetical question propounded to Dr. R. A. Jefferson, who testified for the proponents of the will, contained a full statement of all the material facts necessary to be considered in arriving at a correct answer. In answer to such question, Dr. Jefferson said:

"I have an opinion, as to a reasonable certainty, whether or not on June 29, 1940, at approximately noon, the deceased had sufficient active memory to collect in her mind and comprehend, without prompting, the condition of her property, her relations to her mother and brother and other persons who

might properly be her beneficiaries, and the scope and bearing of her will, and to hold these things in her mind a sufficient length of time, to perceive their obvious relations to each other, and to be able to form some rational judgment in relation to them. In my opinion she was on that date competent to make a will."

The will in question is not a complicated instrument. All of its provisions are in clear, simple language. It was prepared by an attorney of high character and ability, of long practice in Wisconsin, who, with another attorney, signed the attestation clause. They both testified that in their opinion the deceased, at the time of executing the will, was competent, had testamentary capacity, and was under no restraint or apparent undue influence. Their testimony may not be lightly brushed aside, or permitted to be outweighed by circumstances which give rise merely to suspicion. *Will of Schaefer, supra,* p. 414; *Will of Grosse, supra,* p. 480.

The court below found that the execution of the will was procured by the undue influence of Harry L. Manion, by him exercised upon testatrix for and in behalf of himself. The essential elements to be proved in order to establish the fact of undue influence are: (1) A person unquestionably subject to undue influence; (2) opportunity to exercise such influence and effect the wrongful purpose; (3) a disposition to influence unduly for the purpose of procuring an improper favor; and (4) a result clearly appearing to be the effect of the supposed influence. *Will of Raasch,* 230 Wis. 548, 557, 284 N. W. 571; *Will of Stanley,* 226 Wis. 354, 356, 276 N. W. 353; *Will of Leisch,* 221 Wis. 641, 648, 267 N. W. 268; *Will of Grosse, supra; Will of Schaefer, supra.* In *Will of Raasch, supra,* the court held that where three of the elements are established by clear, convincing, and satisfactory evidence, slight additional evidence as to the fourth element may compel the inference of its existence.

In the instant case it may be assumed that Mr. Manion had the opportunity to exercise undue influence on the testatrix. There is no evidence of a disposition on his part to influence testatrix for the purpose of procuring an improper favor; the fact is not established that testatrix was a person subject to undue influence; and, in view of the long, close relationship between testatrix and Mr. Manion, we have no result appearing to be the effect of supposed influence. They were engaged to be married, and had kept steady company for a period of nearly seventeen years. They delayed their marriage out of respect for the wishes of testatrix's mother, who opposed the marriage because Mr. Manion was a divorced man. We think this fact alone demonstrates strong will power on the part of testatrix, and that she was not a person subject to undue influence.

We have here, under all the circumstances, a very natural will. Testatrix accumulated a substantial estate. She had no near relatives living except her aged mother and a bachelor brother. She made ample provision for them in her will. It was only natural that she make some substantial provision, under the circumstances, for Mr. Manion; which provision was to lapse in the event of his marriage. The will provides that upon and after the death of the mother, and also in case she should not be living at the time of testatrix's death, her trustees shall pay to her fiance, Harry L. Manion, out of the net income of the trust estate, the sum of $75 each month, for and during the period of his natural life, and so long as he shall remain unmarried; and the further sum of $25 per month, during his natural life, and so long as he shall remain unmarried, for traveling expenses. She remembered cousins and friends, churches, hospitals, and religious orders, with bequests of either $100 or $200; leaving the residue of her estate to the Milwaukee County Community Fund, which is a nonsectarian charitable organization.

We find no evidence of undue influence. The trial court's findings of mental incompetency and undue influence are against the great weight and clear preponderance of the evidence.

*By the Court.*—Judgment reversed. Cause remanded with directions to admit the will to probate. Costs to be recovered only against respondent Stephen J. Hunt, executor of the estate of Ellen Scherrer, deceased.