ESTATE OF KESICH: KIRCH, Administrator, Appellant, vs. KRAINOVICH, Respondent.

*December 6, 1943—January 18, 1944.*

H. H. *Bodenstab* of Milwaukee, for the appellant.

For the respondent there was a brief by *Leahy & Frederick-son* of Milwaukee, and oral argument by *A. M. Frederickson*.

Fritz, J.   The appellant, Charles Kirch, administrator of the estate of Amelia Pavlovich, deceased, contends that the court's findings and conclusions, on which judgment was entered denying admission to probate of the instrument in question, are contrary to the great weight and clear preponderance of the evidence, which clearly establishes that Peter Kesich was competent on April 6, 1942, to make a will and execute the instrument in question as such on that day; and that it was not procured by undue influence.   It appears without dispute that at the time of his death on June 13, 1942, Kesich was between forty-seven and fifty-two years of age, and a childless

widower with no relatives. He was a Serb, and had resided in Libertyville, Illinois, before coming to Milwaukee, where he operated a grocery business and subsequently a tavern, located on premises which he owned at the time of death. He had also owned an equity in another house and lot, which he purchased in negotiations conducted by Charles Kirch, as a realtor, and resold through Kirch on a land contract, dated March 27, 1942, for $3,350, with a down payment of $500. The land contract was drawn for Kesich, on Kirch's request, by Harold M. Baum, a reputable attorney practicing law for twenty-two years in Milwaukee.

On April 6, 1942, the will in question was drawn by Baum and executed according to law by Kesich with Baum and Kirch signing as the attesting witnesses. By its provisions Kesich directed the payment of his debts and funeral expenses; bequeathed $500 to the Serbian Orthodox church at 724 South Third street, Milwaukee, and a like sum to the Serbian Orthodox church at Libertyville, Illinois; and provided that—

"All the rest, residue and remainder of my estate, real, personal or mixed, I give, devise and bequeath to my friend, Amelia Pavlovich, who is at present in the county hospital on West Wisconsin avenue, Milwaukee, Wisconsin."

Amelia Pavlovich was a patient at that hospital. She died on May 1, 1943, survived by a son, on whose petition Kirch was appointed administrator of her estate. She was not acquainted with either Kirch or Baum, or Dr. Alphonse M. Bodden, who was Kesich's physician between August 27 and October 16, 1940; and again commencing in January, 1942. From the 1st to the 8th of March, 1942, Kesich was a patient at Mount Sinai Hospital in Milwaukee, with some other physician in charge. While Kesich was there on Sunday morning, March 1st, and visiting with a friend, Sam Milokovich, the latter was requested by Kesich to have some one draw a will for him. Milokovich immediately consulted and had a reputa-

ble attorney, Thomas E. Leahy, draw at his office an instrument devising and bequeathing all of Kesich's property to Dmitar Krainovich. Upon Milokovich's return in the afternoon, he read the instrument to Kesich, who then said he was not inclined to sign any will in the hospital. After returning to his home on March 8th, he signed it there on March 13, 1942, and he consulted two Serbian friends, one of whom, an undertaker, testified on the trial that he told Kesich he should "make a will for funeral expenses, how much you want it and where you want to be buried;" that Kesich said if he happened to die he should be buried at Libertyville, and asked how much the funeral would cost; and that Kesich also said he was going to wait a couple of days, and then would make the will to his bartender Dmitar Krainovich.

On March 12th Dr. Bodden was again called to treat Kesich and had him hospitalized on March 13th at St. Mary's Hospital. There Dr. Bodden saw Kesich every day through and after April 6, 1942. On May 21, 1942, he was removed to a psychopathic ward in the county hospital because of his physical and mental condition; and he died there on June 13, 1942. When Kesich was taken to and while at St. Mary's Hospital, he was treated by Dr. Bodden for a hypertensive cardiorenal deficiency, with a definite degeneration of the myocardium of the heart with enlargement and cardiac weakness, hypertension with thickened arteries and a chronic productive nephritis,—inflammation of the kidneys; and secondary, there were congestive conditions in the liver and intestinal tract and the pleura. Because of those matters Kesich was delirious and mentally incapacitated for some days prior to April 5, 1942, and it was necessary to administer narcotics to keep him under control.

The respondent, Krainovich, contends, upon the testimony of two of his witnesses, who visited Kesich at the hospital on April 2d and 3d, respectively, that Kesich then attempted to commit suicide; that on those dates his mind was disturbed

and narcotics were administered very regularly; and that because of having been given narcotics continuously up to April 6th, Kesich had become very agreeable and co-operative, and was willing to do anything that was suggested to him. And respondent contends that according to the testimony of another of his witnesses, Nic Prica, Kesich was mentally disturbed while Prica was visiting him on the afternoon of April 6th.

On the other hand, appellant contends that Kesich's mind was perfectly clear on April 5th and 6th; and that he was fully competent mentally to make his will was established on the trial, without any proof to the contrary or in conflict therewith in any material respect, by uncontradicted and unimpeached evidence to the following effect.

Dr. Bodden testified that he saw Kesich every day at the hospital and that some days,—a week,—before April 6th, Kesich spoke to him about changing a will, and that he wanted a will made and wanted Mr. Baum to draw it for him; that Dr. Bodden did not make any suggestions and did not call Baum on the first day Kesich asked because he was not ready for it, and said he wanted to change his will but wanted to think things over and had not made up his mind what he wanted to do; that Dr. Bodden had a conversation with Baum, which must have been during the time Kesich was physically so sick and was running a temperature of 102, and stated he would call Baum and advise him when Kesich was in a suitable condition to make a will; that about March 28th or 29th Dr. Bodden ordered a "No Visitors" sign put up because of Kesich's physical condition, and when Dr. Bodden thought Kesich was in condition to make a will Dr. Bodden called Baum and gave the nurse in charge authority for Baum to see Kesich; that on April 6, 1942, Dr. Bodden called Baum and told him that Kesich was in good mental and physical condition sufficient to make his will; that in his opinion Kesich on April 6th was perfectly clear mentally and was able to know the amount

of his estate, to whom he was related, who his relatives were and the persons with whom he associated, and was perfectly able to form a rational judgment in relation to his property and to whom he wished to bequeath it; and that Kesich was not incompetent or insane while in the hospital up to and on April 6, 1942, and was not treated for any mental ailments in the hospital.

Baum testified he met Dr. Bodden in the hospital on Sunday, March 29th, and Kesich then told him he wanted to make a will, but had not definitely decided as to its contents, and asked Baum to leave his card so that when he made up his mind as to what he wanted to put in the will it would be convenient for him to have the doctor or nurse call Baum; that on April 6th Baum received a call from Dr. Bodden to come to the hospital because Kesich wanted to make his will, and Baum took a printed form for a will along; that at the hospital Kesich told him he had now decided as to how he wanted his property disposed of; that he wanted $500 to go to a Serbian church in Milwaukee, and likewise $500 to go to a Serbian church at Libertyville, Illinois, and gave the name and address of each church; and that he wanted Amelia Pavlovich, who had suffered a paralytic stroke and was at the county hospital, to have the remainder of his property; and Kesich gave as the reason he wanted the remainder to go to her that she was a very good friend of his and was paralyzed and had no husband and could use the money, and that he had known her for many years and at one time had roomed at her place of business, in connection with which she had some rooms; and that as Baum did not know how her name was spelled, he asked Kesich if he knew, and Kesich said "Yes" and wrote it out on a slip of paper which he handed to Baum, who then copied the name from the slip. Baum testified further that Kesich was conscious and knew absolutely what he was doing when he dictated the terms of the will; that he told Baum he had the property where he was operating the tavern at 1300

South Sixth street, and had a bartender in charge while he was sick; that there were some rooms in the rear of the tavern and a flat upstairs and a cottage in the rear; that he had sold a piece of property under land contract, and there was a mortgage against this property with the First Federal Savings & Loan Association; that he had a 1941 Buick automobile, which was in the garage between the tavern building and the cottage; and that the bartender, who was running the business, would have some cash on hand. Testimony to the same effect was given by Kirch, who was present on April 6th during all of the conference between Kesich and Baum in relation to the will and the execution thereof.

Mary Dougherty, the day nurse, in attendance in Kesich's case at the hospital, testified to the following effect. Kesich gave her instructions not to let anybody in the room unless he told her, but that he did want to see his attorney and Mr. Kirch; that Baum and Kirch came into Kesich's room on April 6th at about 10 o'clock a. m., and she was there all the time; that Kesich told Baum what he wanted in his will, and Baum wrote it on his lap or on the side table; that Kesich told Baum of the two amounts he wanted left to the two churches and then the balance to this one woman, Amelia Pavlovich, whose name Kesich mentioned first; and that when Baum asked Kesich to write the name, Kesich, who was propped on pillows, sat up and wrote the name and handed it to Baum; that Baum asked Kesich if he wanted to leave anything to friends and Kesich said "No," and Baum asked Kesich if he had any relatives and he said "No;" that Baum did not at any time during the conference suggest or tell Kesich what he should put in the will, and the suggestions and terms of the will were dictated and told wholly by Kesich; that Kesich signed the will first and then it was signed by the two witnesses, Baum and Kirch; and the three of them were together when the will was signed and when the signatures were placed thereon; that at the time of the signing of the will, Kesich's mind was per-

fectly clear; and that in her eight years' experience, as a nurse, she had seen people who were not clear, but at no time during the forenoon of April 6th did Peter Kesich show any signs of not knowing what he was doing.

Furthermore, in relation to Kesich's condition, physical and mental, and his mental capacity on and during not only April 6th, but also the preceding 4th and 5th and the following 7th and 8th days of April, there was the following unimpeached evidence in the testimony of Dr. Bodden and the nurse and the hospital records. Dr. Bodden's entries in the hospital records in relation to Kesich are : April 5, "Condition definitely improved this a. m. Mental condition perfectly clear," "sedative;" April 6, "Mental condition perfectly clear," "other orders as above;" April 7, "Mental condition remains perfectly clear," "continue orders as above;" April 8, "Perfectly clear mentally," "continue with . . . sedatives as before." In her reports as the nurse in attendance, Mary Dougherty noted that Dr. Bodden saw and examined the patient at 10:15 a. m. on April 5; at 10 a. m. on April 6; at 8 a. m. on April 7; and 10:30 a. m. on April 8. These entries, in connection with the above-stated entries made by Dr. Bodden, are wholly in accord and convincingly corroborate testimony which was also given by him that on April 5th Kesich's temperature dropped; that on the 5th his condition was definitely improved,—his mental condition was perfectly clear, he was not dyspneic; his temperature was 99, and his mental condition was perfectly clear and his physical condition definitely improved; that on the 6th his mental condition was perfectly clear and his physical condition improved, there was no dyspnea-chest sign, the first condition was cleared up, and his temperature was normal or a little below on April 6th. In addition Dr. Bodden testified that Kesich remained normal for several weeks, and very good until about the 21st of April when his heart and kidneys and everything were going haywire again; that he showed absolutely no disturbance between

the 5th and the 21st of April; that there was no evidence of insanity as long as he treated Kesich at St. Mary's Hospital, and when he tried to jump out of bed that was not insanity, but was delirium he had at the time, and the slightest rise in temperature could cause him to become delirious; and that Kesich was rational at all times that Dr. Bodden treated him with the exception of a couple of times noted in the chart, and one of those times was on April 2d and 3d.

There was also testimony by Mary Dougherty that Kesich was sleeping on April 3d, and while they gave him narcotics on that day, when he was awake he knew what he was doing; that on April 4th he was not under the influence of narcotics as much, and was more alert and more awake on the 4th; and that he was given no narcotics between 7:45 p. m., April 5th, and 8:30 p. m., April 6th. The nurses' entries in the report, in so far as they relate to narcotics given Kesich and his mental condition, are: April 4, Hypo—Pantopon, Hyoscine at 4:45 a. m.; "Has been rational the entire day," 3 p. m.; "Is apparently rational," 8 p. m. April 5, Hypo—Pantopon, Hyoscine at 12:30 a. m.; "Rested well. Appears improved," 7 a. m.; "Visiting with lawyers," 10:15 a. m.; Hypo—Pantopon, for restlessness, 7:45 p. m. April 6, "Oriented to time, place," 7 a. m.; "Visiting lawyers," 12 m.; Hypo—Pantopon, for extreme restlessness, 8:30 p. m.

On the other hand, the only testimony by any witness who saw Kesich on April 6th, which can possibly be deemed to admit of any inference to the contrary in relation to the foregoing proof as to Kesich's mental condition and capacity to then make a valid will, is the following testimony given by Nic Prica, who visited Kesich during the afternoon of that day. After stating that was the first time he saw Kesich at St. Mary's Hospital, he testified:

Well the first thing when I came in I said: "How are you?" "How is everything?" That is always every time I came down I ask him those questions, how does he feel, one thing

and another and he starts on one thing and turns on a, different subject again and he ask me I should take him out of there. He said turn the gas on here, music plays, he said, listen to that music, that is that way day and night, he can't sleep, look at that noise what they are making. Then he ask me for Dan, whether or not Dan Krainovich, Dmitar is here. I said "No." He looked over there towards the door and said: "Here is Dan, come Dan" and I started talking to him again and said: "What are you talking about Pete?" and I turned on this subject and started to talk then for a while nice and then off again. That is the way he acted every time I come down.

This testimony is manifestly of such indefinite and confusing character that it cannot be held sufficient to overcome or warrant the court in disregarding the unimpeached, definite, and apparently well-grounded proof afforded by the testimony of Dr. Bodden, the nurse Mary Dougherty, the attorney Harold M. Baum, who drew the will and was one of the attesting witnesses, and Charles Kirch, the other attesting witness, and the hospital records, all of which convincingly establish that on April 6th and particularly throughout all of the conference during which the will was drawn and executed on that day, Kesich was then mentally competent to make the will. "It is elementary that the question of competency is to be determined as of the time of the execution of the will." *Estate of Wegner,* 185 Wis. 407, 414, 201 N. W. 826. In relation to the testimony given by Baum, a reputable and experienced practicing attorney, there was particularly applicable the rule that testimony of the attorney who drew the will, and one of the subscribing witnesses "may not be lightly brushed aside or permitted to be outweighed by circumstances which give rise merely to suspicions." *Will of Schaefer,* 207 Wis. 404, 414, 241 N. W. 382; *Will of Grosse,* 208 Wis. 473, 480, 243 N. W. 465; *Estate of Scherrer,* 242 Wis. 211, 224, 7 N. W. (2d) 848, 853. And that conclusion may well be considered likewise applicable, under circumstances in this

case, to the testimony of Dr. Bodden, the attending physician who evidently exercised commendable care and sound judgment in deferring the preparation and execution of the will until both he and the attorney were warranted in concluding that the testator was mentally capable to make a will. Both of them, as well as Mary Dougherty, the nurse, were clearly disinterested and unimpeached witnesses; and were far better qualified to testify as to the mental condition and competency of Kesich by reason of their greater opportunities for observation of his conduct and mental condition at the times in question and their professional knowledge and experience on such matters than the witness Prica was. In this case as in *Will of Truehl*, 220 Wis. 134, 140, 264 N. W. 254 (paraphrasing the language then used in the opinion), when we come to examine in detail the testimony offered in support of the contestant's proposition that Kesich was mentally incompetent to execute a will, we find the evidence does no more than show that at the time Kesich was visited by two of the witnesses when he was delirious, he was, either as the result of medicine which had been administered or the effects of his illness, temporarily incapable of executing a will. There is no evidence of lack of capacity at the time of the execution of the will on April 6th. The condition of the testator, as observed by some of the witnesses, and also likewise by Dr. Bodden and the nurses, prior to April 5th and 6th,—

"was not a continuing one, and its existence does not establish such infirmity of mind as would preclude the possibility of the recurrence of mental capacity and active memory sufficient to collect in his mind and comprehend the condition of his property, and his relation to persons who might properly be his beneficiaries, and to hold these things in mind a sufficient length of time to perceive their obvious relation to each other, and to be able to form some rational judgment in relation to them."

Neither does the evidence admit finding that there were in the case at bar the four essential elements stated in *Estate of*

*Scherrer, supra,* p. 224, that must be proven in order to establish undue influence, which is a species of fraud that must be established by clear, convincing, and satisfactory evidence. *Will of Schaefer, supra; Estate of Scherrer, supra.* There is no proof which reasonably admits of finding that Kesich was unquestionably subject to undue influence by any of the beneficiaries or the executor named in the will; or that there was a disposition or opportunity on their part or anyone else to influence him unduly for the purpose of procuring an improper favor, or a result which can be considered to appear to be the effect of the supposed influence. Amelia Pavlovich was a paralytic invalid confined in another hospital and neither she nor either of the church congregations named as legatees under the will appear to have had any knowledge of the drawing or execution of the will, or to have participated in the inducing or procuring thereof. They evidently were designated the legatees and devisees under the will at solely the instigation of the testator himself, and as they were apparently unknown to any of the persons present during the preparation or execution of the will, the latter cannot be deemed to have had any disposition to influence Kesich in relation thereto. Moreover, in the absence of any relatives or any other party who can be considered to be primarily entitled to the testator's bounty, there was nothing unnatural in his favoring, as he did, his friend Amelia Pavlovich, in view of her helpless condition, and the churches of his choice, one of which was located at Libertyville, Illinois, where he had resided and where he desired to be buried. The mere fact he designated Kirch as the executor, and that the latter was present during the conference at which the will was prepared, and was one of the attesting witnesses, does not warrant, under the circumstances in this case, any inference that any undue influence was exercised by him.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment admitting the will to probate.