ESTATE OF SVENDSO: SHERRY, Appellant, vs. SVENDSO, Respondent.

*June 7—June 30, 1950.*

*M. N. Daffinrud* of Viroqua, attorney, and *Daniel H. Grady* of Portage of counsel, for the appellant.

For the respondent there was a brief by *Hale, Skemp, Nietsch, Hanson & Schnurrer* of La Crosse, and oral argument by *Quincy H. Hale.*

FAIRCHILD, J. Ole K. Svendso, a prosperous farmer and tobacco grower, the father of one son, Kayus Svendso, made and executed a will in March, 1944. The circumstances which must be considered will be briefly reviewed. We may start with the proposition that the will referred to was a proper and effective instrument, validly executed by the deceased.

Under that will Ole K. Svendso devised to his son a limited portion of his estate. The major part of the property devised to his son was a one-third (curtesy) interest which had come to the deceased by reason of the death of his wife. By reference to the statement of facts it will be seen that the limitations of devise and bequest to the son indicated the existence of some feeling adverse to the wife of the son as well as perhaps some dissatisfaction with the son himself, although the son and his wife were at all times intimate and associating with the father. However that may be, there is

no claim of impaired mental condition or strength of character of the deceased at the time the will was made.

The point raised and the question now presented is as to whether Ole K. Svendso was induced by undue influence to destroy that will. With relation to the destroying of the will on February 3, 1949, the court, referring to evidence which amply supports the finding, ruled that during the period (the 13th of January, 1949, to the 23d of February, 1949), that Ole Svendso was in the Lutheran Hospital in La Crosse he was not a person susceptible to undue influence. The trial court found "that said Kayus Svendso, his son, was not disposed to influence him unduly for the purpose of procuring improper favors; and that the destruction of the will was not the effect of undue influence exercised by the said Kayus Svendso." The trial court also found "that on February 23, 1949, the said Ole K. Svendso had sufficiently recovered his health so as to return and he did on said date return to his home at Viroqua." This was twenty days after February 3d, the time the will was destroyed. And the court said "that at said time Ole K. Svendso was of sound mind and continued in that mental condition until a few days before his death."

The fact that the will was made in March, 1944, was known to a very limited number, Kayus Svendso having no knowledge whatever of the execution or existence of that will until January 30, 1949, during the time that his father was in the hospital at La Crosse. There is evidence of the existence of an intention on the part of the testator as early as 1946 to reconsider the matter of his disposition of the estate and the manner in which he had treated his son. The father had inherited from his wife the one third of the farm which had belonged to her. The son had inherited the balance and desired to buy the one third from the father. The father had refused to sell it to him. However, he had changed his mind, and in 1946 did sell his interest in the farm to the son for the sum of $6,000. This, as a practical matter, re-

duced very considerably the amount which the father had devised to his son in his will of March, 1944. It appears from the evidence that Mr. Conrad Allness, an old friend and business adviser, whose name frequently appears in the proceedings, testified that on February 19, 1946: "I was along and made the real-estate and personal-property deal between Kayus Svendso and Ole K. Svendso. . . . The consideration [of the one-third interest] was $4,000, and the consideration of all the personal property was $2,000. I was present. The cash was paid by Kayus Svendso to him in my presence. I advised him to buy government bonds. We bought two bonds, one bond for $5,000, and one bond for $1,000, and those two bonds are listed in the inventory of this estate in the name of Ole K. Svendso. I am the administrator of the estate. This one-third real-estate interest was the same one-third interest he had given the boy under the will. On February 19, 1946, at the bank, he said, 'Now I want to change my will, because the land that Kayus has bought, and the personal property that Kayus has bought was named in the will.' I said I would be glad to assist him at any time. After that transaction I saw him in 1947 and in 1948. Both times with me on a trip. I would say his mind was very good. He was a man with a will of his own. He was a strong-willed man." Those statements were made in response to a question as to Mr. Svendso's mental condition in 1947 and 1948. The witness was of the same opinion as to the testator's mental condition and strength of character at the time the will was revoked.

Under the rules of evidence the son was not allowed ro repeat the conversation which he had with his father on January 30, 1949. All the trial court could know about it would be the light shed by the results following. There would be no impropriety in the son's calling attention to the "spot" in which he had placed himself by purchasing property devised to him in the will. The exercise of undue

influence must be proved by clear, satisfactory, and convincing evidence. There would be no impropriety in a son discussing with his father the situation which suddenly developed before the son by reason of the purchase of his interest in the farm and being just advised of the existence of a will. In *Will of Grosse,* 208 Wis. 473, 243 N. W. 465, Mr. Justice WICKHEM recognized the rule that undue influence cannot be presumed from mere conjecture or suspicion, and evidence that a beneficiary reminded testatrix of a promise to make a will, called an attorney, procured the witnesses, and, on the occasion of the execution, before leaving the room, reminded testatrix in that case that she had promised to leave the beneficiary a certain flat, did not under the circumstances of that case—which are not altogether out of line with this case—constitute a clear showing of undue influence.

The evidence does show also that the son had been diligent and faithful in his services to his father. By reason of the exchange in title of the one-third interest, had the father died while the will was in existence, the son would have had a life estate in a wood lot, another twenty acres of land, and an interest in some government bonds. The balance of the estate, including, of course, the sum of $6,000 which the son had, in 1946, paid for the interest bequeathed and devised to him, would have gone to relatives, including a brother, who will be mentioned later, and the appellant, who is a nephew of the deceased's wife. The brother who was named in the will was William Svendso. In his testimony there appears to to have been no doubt about the mental condition of the deceased being "very good." This brother visited him at the hospital, as appears from the record, at least seven times, rode home with him from the hospital, and after the return of Svendso to his home in Viroqua, this brother visited him two or three times a day.

In addition to the declared intention of changing the will already mentioned, Svendso again, in 1948, stated his inten-

tion to make a change. This appears from the testimony of the brother, William, who said that in July, 1948, in a conversation with the testator he (the testator) said: "I have fixed up something. And I am going to change it. There was somebody that told me to do this." And then he (the testator) said, "Andrew Sherry and Borgen and another fellow have told him to." The witness then replied "Better you figure it out yourself." And Ole Svendso replied, "I figure. I am going to change that." There was no undue haste on the part of the testator, for the matter remained undisturbed up to the time the deceased was in the hospital at La Crosse. It is important to have in mind that up to January 30, 1949, the son had no knowledge of the existence of a will. There were frequent visitors at the hospital, the son among them. And he visited his father on the 30th day of January. The circumstances surrounding this visit indicate clearly that it was at that time that the existence of a will was brought to the son's attention, for it was after that visit that the old friend and business adviser, Mr. Allness, who knew of the existence of the will was visited by the son. The son testified, as did the business adviser, that they called on the attorney who drew the will. There is certainty as to what happened after that. The attorney, when visited by the son and the adviser, upon the suggestion of Mr. Allness, decided to await the production of a written order from the father for the delivery of the will. Conrad Allness and the son then returned to the hospital, and a written direction, signed by the father, calling for the delivery of the will to Kayus Svendso, was made. This, in turn, was taken to Attorney Schlintz, who delivered the will, and Allness and the son then took the will to the father at the hospital, where the following things occurred.

In the hearing of Kayus and the father, Conrad Allness read the will three times, and the father then directed that the will be placed in the box at the bank in Viroqua. The next

day, February 1st, Mr. Allness and the son met at the bank and placed the will in a box which was then listed in the name of Kayus Svendso, his wife, Sophia Svendso, and the maker of the will. On the following day the son visited with his father, and later with the lawyer, Mr. W. G. Schlintz of Viroqua. He told the attorney that the father wanted to destroy his will. The attorney advised that the father should destroy the will himself in the presence of two witnesses whose names should be preserved. The son took the will from the bank to his father at the Lutheran Hospital. There was some talk with two of the nurses about witnessing the destruction of the will, but they stated that the hospital rules forbade their doing it. The will was then left with the father. On February 3d, the son talked with Mr. Allness, and the two went to the city of La Crosse, the son going to the hospital, and Mr. Allness to ask an old friend of the father's to come to the hospital to witness the destruction of the will. This friend was ill, and Mr. Allness returned to the hospital without him. Mr. Allness then called at the office of the Gundersen Clinic and interviewed Dr. Thoralf Gundersen, the attending physician of Ole K. Svendso, explaining to Dr. Gundersen that the old gentleman wished to destroy his will and wanted witnesses to be present, and that he (Mr. Allness) desired the attending physician to witness the destruction so that there would be no question about the matter being properly performed under proper conditions. Dr. Gundersen was delayed for a time but agreed to witness the destruction of the will. When at liberty he, with Conrad Allness, went to the hospital room where Ole K. Svendso and his son were. The testimony is that at the time Dr. Gundersen and Mr. Allness entered the room Ole K. Svendso was sitting up in bed. The doctor asked him in Norwegian whether he wanted to destroy the will, and the old gentleman said, in English, "I want to tear it up." The will was then handed to Dr. Gundersen, who examined it to satisfy himself what the paper was. After examining it, the doctor handed

it to Mr. Svendso (the testator), who tore it into three pieces and handed the three pieces to his son, Kayus Svendso. These pieces were thrown into the wastebasket. Dr. Gundersen was called as a witness on the trial and testified that: "The patient was never on the danger list while in the hospital. I saw him at least daily, several times twice a day. There was no evidence of insanity or mental sickness. On the morning the will was destroyed I believe that his mind was normal. There was no evidence of leading or urging on the part of the son while I was there."

After the will was destroyed, things continued as they had during testator's stay at the hospital. The old gentleman improved, and on February 23, 1949, he returned to his home at Viroqua, his son and the brother William, taking him home. After the arrival home, the daughter-in-law stayed with Ole K. Svendso until a registered nurse was employed. A housekeeper was also employed. The son visited his father frequently. There was no anticipation of immediate dissolution, and matters stood as thus described until the 21st of March, 1949, when Ole K. Svendso died from uremia which set in two weeks before his death and was due to old age and bronchial asthma from which he had been suffering.

Now the question arises as to the sufficiency of the evidence which the trial court accepted as reliable to sustain the findings on which the judgment is based and which has a bearing upon the existence or the exercise of undue influence. There was evidence offered by the proponents showing the use of drugs; the illness of Svendso, and there is some opinion evidence of his physical weakness. But the evidence on which the court relied, having accepted it as the credible and convincing evidence, sustains the findings made by the trial court.

It now appears that in March, 1944, Ole K. Svendso executed a will in which he bequeathed and devised his property valued at some $40,000 as follows: A part amounting to

about $15,000 to his brother, William, and a part amounting to about the same to a nephew of his deceased wife. He gave to his son in that will his one-third interest in a farm inherited from his deceased wife, the mother of Kayus. There were other lesser bequests, including those to the church and to the mission. No question is raised as to that will being the result of his own judgment, although he may have acted upon the suggestion arising from conversation with others. The trial court was of the opinion that he was prompted entirely by his then existing desire to have his estate descend according to that plan. This will was later, on February 3, 1949, destroyed by the testator. He did not make another will, and died March 21, 1949, his only heir being the son, Kayus Svendso. It is apparent that the deceased considered plans for some time before reaching a definite conclusion as to what he intended to do. In his note to the lawyer asking to have the will sent to him, he spoke of making a change in his will. This may indicate an intention to draw another will. In 1946, after selling his interest in the farm to his son, he spoke to his friend, Conrad Allness, indicating that he was planning on making a change in the will, but by 1948 he had made no change; and in July of that year he talked with his brother about making a change, but nothing carrying out that plan was done until January and February, 1949, when the will was destroyed.

The nephew, Annial Sherry, who was named as a legatee in the will asks to have that will admitted to probate on the ground that its destruction was brought about by the use of undue influence upon one whose mental condition was such as to render him subject to undue influence. At the time the will was torn up by Ole K. Svendso he was eighty years old. He was suffering from what was described by his physician as bronchial asthma and generalized arteriosclerosis with coronary disease, and edema.

There is no reason discoverable or to be read out of any of the testimony accepted by the trial court for holding other than that he was at all times when acts material in this proceeding occurred in full possession of his mental faculties. The trial court so found on sufficient and competent evidence. Nor is there reason for disturbing the determination by the court of the question as to whether he was so circumstanced by reason of infirmity due to age and illness or so controlled that his destruction of the will of March, 1944, was not procured by the undue influence of Kayus Svendso. There are some things urged on the part of the proponent of the will which, standing by themselves, seem to color the transaction. For instance, reference is made to a statement of Kayus to the effect that "if I wouldn't have gotten this will torn up I would be in an awful spot." The serious import which might have been carried by that statement is modified when those words are read in connection with the fact that a portion of the estate which the father had proposed to will to the son was purchased by the son after the will was made. In plain words, he would have purchased his gift and contributed $6,000 to the estate. We have already made reference to the fact that in 1946 and in 1948 the father's satisfaction with the will was not as complete as it had been when he made it, and that in a conversation with Mr. Allness and the brother, who was a large beneficiary under the will, he used language which indicated a proposed change. This would naturally result from the 1946 transaction just mentioned and would prompt some change at least in that respect if in no other. He may have intended to make another will. He had the capability of doing so as well as plenty of opportunity to do so. That he did not do so does not impair the effectiveness of the revocation of the will on February 3, 1949.

To begin with, in our consideration of the correctness of the findings of the trial court we must remember that one

has as much right to change or destroy a will after making it as to make it. As frequently stated in court opinions and by text writers upon the subject of wills, it is of course elementary that the right must be exercised when one has testamentary capacity and when he is not subject to undue influence. Mr. Justice NELSON, in *Will of Schaefer*, 207 Wis. 404, 241 N. W. 382, said the general characteristics of undue influence are stated by Mr. Justice MARSHALL in *Will of Ball*, 153 Wis. 27, 38, 141 N. W. 8, to be: "The actor is treated as a wrongdoer—one bent upon a reprehensible purpose; the other as his unwilling or unsuspecting, in any event under the circumstances, powerless victim of the purpose effected by 'that subtle species of fraud,'—where such helplessness to resist direct or indirect suggestion is produced by 'insidious approaches, seductive artifices, or other species of circumvention.' Undue influence is the very antithesis of right influence. It exists only where there is practical destruction of voluntary volition,—at least, is moral coercion for an ulterior purpose." The father in this instance may have been a man whose attitude varied somewhat when circumstances pleased or displeased him. But he was not required to make such a will as a court or an heir might feel equitable, or to refrain from changing or destroying a will already made.

In its findings of fact, the trial court recites that Kayus Svendso endeavored to purchase the undivided one-third interest of his father, Ole K. Svendso, in said farm in January, 1944, and some friction over said transaction developed between Ole K. Svendso and his son, Kayus Svendso; that while that friction existed between the father and son and son's wife, the father, in company with his business adviser, Conrad Allness, in March, 1944, made and executed his will, being the same will which was torn up by testator on February 3, 1949.

From the record it is clear that the deceased was visited by many friends and relatives both while he was at the hospital

and after he returned to his home in Viroqua. There was no effort on the part of anyone to exclude visitors, relatives, or business associates. He was capable of communicating with others and did so. There is no evidence in the case that Kayus Svendso tried to keep people away from his father at any time, and it is clear that deceased had ample time and opportunity to draw a second will if he felt any misgiving about the destruction of the will.

With relation to the witness, Conrad Allness, whose testimony is of consequence in this case, the trial court expressed his opinion of him and the convincing quality of his character and the reliability of his testimony by saying of him that he was "an experienced business man, and extremely well thought of in his community; that the said Conrad Allness had for years acted as consultant for many residents of Vernon county who were of Scandinavian descent and has frequently been appointed administrator or guardian by the county court for Vernon county; that the said Conrad Allness is related to the wife of proponent, Annial Sherry." And then the court reaches the final and ultimate fact in its finding where it says:

"That on the morning of February 3, 1949, Kayus Svendso and Conrad Allness went to the Lutheran Hospital in La Crosse; that Dr. Thoralf Gundersen was called as a witness and Ole K. Svendso was asked if he wanted to destroy his will and he said that he did, and in the presence of the said Conrad Allness, Kayus Svendso, and Dr. Thoralf Gundersen said will was, on the 3d day of February, 1949, revoked, by the said Ole K. Svendso personally tearing the same with the intention of revoking it; that at said time said Ole K. Svendso was of sound mind and under no undue influence and revoked his said will of his own free will."

The trial court's conclusion must be sustained. The evidence pertaining to the relation of the father and son, though varying somewhat throughout the years, does not furnish a basis for a claim that the destruction of the will was not a reasonable and natural act.

It is considered that the conclusion of the trial court that the decedent died intestate, leaving as his sole surviving heir his son, Kayus Svendso, is sustained by the evidence. The proposed will was legally destroyed. Its probate was properly denied.

*By the Court.*—Judgment affirmed.