WILL OF RUSSELL: SARGENT and others, Appellants,
vs. KUJATH and others, Respondents.

*September 7—October 3, 1950.*

For the appellants there was a brief by *Rogers & Owens,* and oral argument by *Harlan B. Rogers* and *Bruce J. Rogers,* all of Portage.

*Andrew P. Cotter* and *Vincent F. McNamara,* attorneys, and *Dan R. McNamara* of counsel, all of Montello, for the respondents.

FRITZ, C. J.  On this appeal the contestants contend (1) that undue influence was exercised upon the testatrix, Agnes E. Russell; (2) that she was suffering from and influenced and controlled by paranoid delusions against her sister, Grace Skinner, and the children and wife of her deceased brother, Samuel Russell, Jr., which affected her in making the will in question; and (3) that mutual wills had been drawn by her and her brother Frank (who subsequently predeceased her)

pursuant to an agreement that all their surviving heirs should inherit the property equally. The testatrix, Agnes E. Russell, was born in 1870 on a farm of five hundred twenty acres owned by her father, Samuel Russell. She was one of a family of seven children, three boys and four girls, one of whom died when sixteen years old. The testatrix was seventy-eight years old when she died in January, 1948. The will offered for probate as her last will was executed on November 16, 1946, when she was seventy-six years of age. By that will she left all of her property to the children and grandchildren of her deceased brother, Willie Russell, who was her nephew and her adopted brother by reason of his adoption by her parents. Her other surviving heirs at law are a sister, Grace Skinner, and the children of a deceased brother, Samuel Russell, Jr.; but none of them is a beneficiary under said last will. Her parents and her brothers, Samuel, Jr., Frank, Hugh, and Willie, and her sisters Jennie and Izabell predeceased her; and none of them, other than Samuel Russell, Jr., and Willie Russell left heirs who could have inherited from Agnes E. Russell under the laws of descent.

Testatrix's older sister married and, after a short married life, separated from her husband and returned home with an infant son; and shortly thereafter she died and her parents adopted the infant son, who became known as William (Willie) Russell. Her two older brothers, Samuel, Jr., and Hugh, went to Dakota and there established themselves as farmers. Testatrix, after graduating from high school, taught school until 1896 or 1897. Her younger sister, Grace, married Thomas Skinner in 1895, and a year after their marriage they moved away from the farm. Her youngest brother, Frank, lived on the farm during his entire life, and between 1905 and 1912 he married Cora Buttles. In 1911 testatrix moved with her parents to the village of Westfield and resided there until upon the death of Frank's wife in 1916 or 1917

testatrix and her mother returned to the farm and resided there until their respective deaths. There is testimony under which the contestants claim that until 1912 testatrix and Frank and her parents were in a constant state of emotional upset, during which she evinced fear, extreme jealousy, a sense of insecurity, suspicion, and a feeling that she was being spied upon and imposed upon by the other members of her family; that she was a shy, quiet, introspective child and young woman, and her main interest was in flowers, trees, birds, bees, and outdoor life; that she had no association with boys or men during her entire lifetime, and attended public gatherings as a girl only when accompanied by her sister; that her social life was very limited and she rarely spoke to friends or acquaintances unless they first spoke to her; that for months at a time she refused to speak to Frank, and she searched his rooms, and accused him of attempting to attack her; that she evinced inordinate interest in the supposed sexual irregularities of respectable people, and a fear that her brother was insane and that her parents were hiding things from her; and contestants claim that during this period she exhibited all of the symptoms of a paranoiac.

While residing in Westfield her father informed testatrix he had sold the central homestead of one hundred sixty acres of the farm to Frank, and her father and Ferd Meinke, a reputable notary public, executed a deed for the one hundred sixty acres to Frank; and testatrix claimed that this deed was forged because Meinke had signed the mother's name; and she attempted to have her father and Meinke arrested for forgery. Meinke informed her that the deed was all right, but she refused to believe him, so in August, 1912, a correction deed was executed by her father and mother.

In 1913 the father became seriously ill and one night testatrix brought Ferd Meinke to their home and had a will drawn by him and executed by her father, which left sub-

stantially all of the property owned by him to Agnes, with a life use to her mother. Shortly after the will was executed the father lapsed into a coma, and although Agnes had the will in her possession, she refused to tell her brother Frank what its provisions were, and she did not tell her sister Grace of the execution of the will until after her father was in the coma which was followed by his death. After his death testatrix had her sister Grace help her move a trunk, in which the father kept his money and valuable papers, from his room to a room upstairs, and there she covered it with quilts and blankets. She denied to everyone that there was any money or papers of value of any kind on the premises, and she failed to disclose to the executor named in her father's will that there was in the trunk an amount in excess of $15,000 in gold, cash, and securities; and she concealed that fact from the members of the family, including her mother, who had a life use of the property. She reported to the executor, her attorney, the court, and the appraisers the property as constituting her father's estate: Real estate, $12,500; personal property, $9,358.87; stock and machinery, $1,830; total, $23,688.87. But she withheld and concealed from everyone except her brother Samuel the following items: Gold and cash, $9,110; note for $4,800; two smaller notes—amounts not shown; and property she permitted Frank to claim and hold, $2,300; total, $16,210 (plus). But she did confide to Samuel the existence of these securities and cash, and arranged to send them secretly to him to hold for her benefit; and subsequently she secured from Samuel a note for the amount sent to him as evidence of the amount he had received from her and invested for her benefit in his name.

When their father, Samuel Russell, Sr., died in 1913, he bequeathed to each of his children $100 and willed the rest of his property to Agnes (the testatrix), subject to a life estate in favor of his wife. Testatrix's sister, Grace Skinner,

was dissatisfied with the terms of that will and instituted a will contest by objecting to the probate thereof on the ground that their father was incompetent at the time of its execution. As the result of that contest a feeling of antagonism developed between Grace and Agnes. Contestants claim that during the three years the will contest was pending the testatrix labored under a sense of guilt for her conduct in concealing the money and property; and that she permitted Frank to claim property on the farm which he did not own in order to purchase his silence. The brothers, Frank and Hugh, declined to take any part in the contest; and her adopted brother, Willie, refused to have anything to do with the matter on either side.

When the contest in relation to the father's will and estate terminated in December, 1916, testatrix continued to insist that her brother Samuel continue to hold and invest in his name in South Dakota the money, etc., she sent to him, although he repeatedly offered to send it back. When he died in 1925 testatrix filed a claim against his estate,—which was appraised at $60,000,—for $15,192 as principal and interest on the note she received from him for the money and securities, and she insisted upon the payment thereof in full. This resulted in considerable ill feeling, bitter correspondence, and the severance of friendly relations between testatrix and the wife and children of her brother Samuel. Testatrix retained an attorney and after several trips to South Dakota her claim was compromised at $11,000; and as a consequence the relations between the wife and children of her brother Samuel and the testatrix became strained, and she had nothing further to do with his family. When in 1936 her nephew, R. M. Russell, who proponents claim had been her favorite, and her niece, Julia Sargent, and her daughter visited at the farm where Frank and testatrix lived, she was cold and treated them as strangers, while Frank was cordial to them,

and at his instance they stayed overnight on the farm. R. M. Russell saw her only twice before their relations became strained, and the only communication between them was one Christmas card sent by him to which the testatrix did not reply.

On the other hand, during a considerable portion of testatrix's life Willie Russell, the son of her deceased sister, and the grandson and adopted son of testatrix's parents, had resided at the Russell farm, and she was very fond of him as a youth and later during his manhood. He became a dentist and resided at Wautoma, Wisconsin, and she visited him frequently until his death; and after the death of her brother Frank she executed a will in which she left all of her property to Willie Russell. Stella Kujath and Allene Kinstler are his children, and Kay Lee and Alice Allene Kujath are his grandchildren, and they are the sole beneficiaries under the terms of testatrix's will, dated November 16, 1946, which was admitted to probate by the judgment of the county court, which on an appeal and trial *de novo* in the circuit court was affirmed.

In 1936 testatrix and her brother Frank each executed a will under which each left to the other all of her or his property. Agnes still evinced a distrust of and a desire to exclude her sister Grace from participating in her property, but Frank expressed a desire to have it divided among the families of their relatives equally. When he died in 1941 Agnes failed to notify the families of his death, and they had no notice of the proceedings for the probate of his will, which she offered for probate, and by which she received his property. After his estate was settled, she directed her attorney, John A. Conant, to draw a new will, which was in accordance with Frank's desire to divide the property among the families of Grace Skinner, Samuel Russell, Jr., and her adopted brother, William Russell; but that instrument was never

executed by her. Although she had an appointment with Mr. Conant for the afternoon, she went instead to Montello, an adjoining town, and had a will prepared by Burton Hoffmann, but she did not execute that instrument. Instead she had Andrew Cotter, the district attorney at Montello, with whom she had had minor previous business relations, prepare the instrument duly executed by her at his office on November 16, 1946, as her last will, and this instrument the proponents offered for probate. Andrew Cotter testified:

"No one was with Miss Russell when she came in to see me about a will and she had no memorandum with her except this previous will."

William Hamilton, a friend of testatrix, testified:

"I took her down to Mr. Cotter once where I thought she drew a will."

But there is also testimony that at her request she rode to Montello in the automobile of Howard Kujath, the husband of her grandniece Stella Kujath, who is one of the proponents. The fact of her execution of the will was not disclosed to relatives except the Kujath family. The will leaves the bulk of testatrix's estate to Stella Kujath and her children; three fourths to them, and only one fourth to Allene Kinstler, her sister.

In addition to testimony as to matters stated above there is ample testimony, which the court could consider credible and sufficient to establish the following facts. The testatrix as a girl and as a woman was bright and intelligent. In addition to teaching school for several years, she was active and interested in school affairs, and for a period was a school officer, and attended school and town meetings. She attended church, and for a time was superintendent of the Sunday school. She was also active in the work of the county fair; and had charge of a department at the fair and of the

exhibits thereof up to the fall prior to her death. After the death of her father very little work was done upon the buildings on the farm, and they were in such condition that it was impossible to operate the farm in a profitable manner. She discussed with her tenant the necessity for improving the buildings and constructing additional buildings and endeavored to procure this work to be done, but due to war conditions she was unable to accomplish these improvements until 1946, when she undertook an extensive program of building and improvements, which, in the opinion of her tenant and others, was necessary and justifiable.

Drs. Raymond B. Dryer and Jefferson A. Klepfer, who had never seen or known the testatrix, but are licensed to practice as physicians and have had special training and practice in psychiatry, testified in answer to hypothetical questions.

Dr. Dryer testified that he has an opinion to a reasonable certainty as to the mental condition of testatrix on November 16, 1946, that could be diagnosed as a case of paranoid personalty. A person with a paranoid personality is an individual who exhibits suspiciousness, envy, extreme jealousy, who has feeling of guilt and who exhibits hatred toward those people who the individual suspects of spying or harming them. In his opinion Agnes E. Russell was suffering from a delusion with respect to her sister, Grace Skinner. A person who is subject to paranoid delusions is easily subjected to influence and to act in accordance with the delusion. The existence on November 16, 1946, of such delusions would materially affect the making of such will by Agnes Russell in so far as such will referred to her surviving sister, Grace Skinner, who was her natural beneficiary. It is his opinion that the existence of such delusions was continuous. The existence of such delusions would materially affect the making of a will by the decedent so far as the will affected her surviving sister, a natural beneficiary of decedent's will. If a person is suffering from a delusion with respect to a mem-

ber of her family, the delusion would be present even though it did not appear in her ordinary conduct with others. It is his opinion that the decedent described in the hypothetical question was suffering from delusions which materially affected her will.

Dr. Klepfer testified that in his opinion to a reasonable certainty the testatrix had been suffering from a paranoid constitution or personality that is evidenced by introversion ideas of persecution, overly suspicious, fear and insecurity, jealousy, altogether which are necessary to make the picture of this type of individual; and that at the time she executed such will she was suffering from delusions, which in his opinion were of a chronic nature, and had been present over a long period of time; and that the existence of such delusions would materially affect the making of a will by the decedent in so far as such will referred to her surviving sister and the children of her deceased older brother, who were natural beneficiaries.

On the other hand, there was testimony by physicians licensed to practice medicine to the following effect:

Dr. A. A. Beck testified he had been acquainted with Agnes Russell since about 1922, and had known her from that time until her death, and he became quite well acquainted with her and attended her just once in a medical capacity in 1946 when he made an examination of her. He saw her at Dr. Willie Russell's home quite frequently during his last illness. From his association with her he would say that she was an intelligent woman, and that he did not see any deterioration in her mental condition during the time he knew her. She was not suffering from any physical ailment that would impair her mental capacity. It is his opinion that she was of sound mind at the time he treated her in 1946. He found no abnormal conditions in Agnes Russell.

Dr. W. A. Taylor testified that Agnes Russell became a patient of his as a physician in January, 1939, and as such he treated her three times in 1939, twice in 1942, once in 1945, and also on April 20, May 5, July 18, and in October and on December 16, 1946, and at the hospital from January 7 to 9,

1948, when she died. During the times he saw her he had conversations with her but there was no reason why he should consider her mental condition. She seemed perfectly normal to him and he did not notice any mental deterioration in her.

Dr. Ovid O. Meyer testified he examined Agnes Russell on October 25, 1946, and spent an hour to an hour and a half with her. During this examination he made an observation as to her mental condition as a part of his routine of physical examination. Based on his examination and conversation he considered her to be a mentally alert, intelligent woman of seventy-six. He also stated that he could make the same type of finding as to a person who was a paranoiac if he failed to discover the source of his delusion.

Dr. R. F. Inman testified that during the course of the physical examination of Agnes Russell on June 20, 1946, he questioned her relative to her condition and so forth, and based on his examination at that time he would say she was then of sound mind.

Upon our review of the evidence on the trial in the circuit court it is clearly evident that the court's written opinion, and findings of fact and conclusions of law, and the judgment entered thereon were fully warranted in all respects. And to the court's findings of fact there is applicable the rule,—

". . . that although there are conflicts in some of the testimony of the witnesses, the determination of their credibility and the weight of their testimony was primarily for the trial court, and that as there was sufficient basis in the evidence to sustain its findings and they are not contrary to the clear preponderance of the credible evidence, they cannot be disturbed on this appeal, and therefore must be sustained. *Interior Woodwork Co. v. Buhler,* 207 Wis. 1, 6, 238 N. W. 822." *Western Industries, Inc., v. Vilter Mfg. Co.* ante, pp. 268, 297, 43 N. W. (2d) 430.

Briefly summarized, it suffices to note here that Judge BEILFUSS rightly stated in the course of his opinion and findings of fact and conclusions of law the following:

The testatrix came to the office of Attorney Andrew P. Cotter alone. He testified that she discussed the terms of her will alone with him, and it was drawn by him at her request, and signed and executed by her in the presence of Cotter and a traffic officer. "The testatrix at the time of the execution of said will was fully competent to execute the same. She fully comprehended the nature and extent of her property. She knew the natural objects of her bounty. She had the ability to keep in mind the nature of her property, the extent of same and the natural objects of her bounty, and keep them in mental relation one to another and to know the cause and effect of the instrument she was executing. At the time of the execution of said instrument testatrix was suffering from no mental incapacity which would render her incompetent to make a will. . . .

"Several physicians residing in that vicinity who had treated her on various occasions shortly before and shortly after the execution of the will testified that she was physically and mentally normal and possessed of more than ordinary intelligence and business ability. They, together with several of her close associates, all testified that she was mentally alert and normal and well able to know what she was doing in any of her business affairs."

She "was not at the time of the execution of said will suffering from any insane delusion which would render her incompetent to execute the will" and "the execution thereof is in no manner the result of any insane delusions of the testatrix. . . .

"During her entire life she was extremely conservative and cautious in money matters, almost to the point of being penurious. Her social activities were very limited, although she did attend town meetings and school meetings and in addition thereto was superintendent of the floral exhibits at the Marquette county fair for many years. She had the reputation of being fair and honest in all her business dealings but extremely careful. She was a poor housekeeper and lived in what might be called a slovenly manner due in all probability to her extreme thrift. Mr. John Conant, of Westfield, had been her attorney for many years and had given her legal assistance many times. He testified that she was a very capa-

ble business woman, bright and alert right up to the time of her death and that she knew her own desires and was not easily influenced against them. . . .

"From the evidence it is the opinion of the court that Agnes E. Russell was an eccentric; that she either committed a serious fraud or thought she did, and had many characteristics that set her apart from those of the generally accepted course of conduct. However, none of these traits can of and in themselves classify her as the victim of an insane delusion. Every person has slight peculiarities of his own, which never cause any suspicion of his testamentary capacity. It is only when they become pronounced by contrast with those about him that they become known as eccentricities, and are invoked to discredit his testamentary capacity. Eccentricity has no effect on testamentary capacity; and wills of persons who are highly eccentric, and in some cases eccentric to the verge of insanity have been upheld. This is especially true where eccentricity is due, not to any form of mental derangement, but to vanity, selfishness and the like. . . .

"It was without dispute that the testatrix had not been on friendly terms with the contestant, Grace Skinner, since the death of their father in 1913, and with the children of Samuel Russell, Jr., since 1926. . . .

"Prior to the contest of their father's will by Grace Skinner the relations between Grace Skinner and Agnes E. Russell were cordial and confidential. The conflict was without question one between Grace and Agnes—during this contest, which extended some two years, and thereafter their contacts with each other ceased and undoubtedly a hostility existed between them at least on the part of Agnes. The very same pattern exists in the case of the relations between Agnes and Sam, Jr's., children. Hostility resulted during and after litigation. Everyone who has had a part in the administration of our law has many times witnessed this identical effect, well knowing that in many instances this result is unwarranted and further never questioning the mental capacity of those individuals because of such conduct. 'The fact that testator dislikes certain of the natural objects of his bounty does not establish an insane delusion; even if such dislike is

based upon some reason, although it may be an unjust one.' 1 Page, Wills (3d ed. 1941), p. 299, sec. 146. . . .

"The record further reveals that she had been friendly with her brother Willie Russell until his death and with his children thereafter. . . . Mr. and Mrs. Howard Kujath frequently visited her on the farm for a number of years prior to her death. . . . The record does not reveal evidence sufficient to warrant a finding of any undue influence exercised by Howard Kujath, Stella Kujath, or any other person upon the deceased, Agnes E. Russell, so as to invalidate her will of November 16, 1946."

Moreover as the will is in favor of the children and grandchildren of testatrix's adopted brother, Willie Russell, her lifelong favorite, in whose favor she had drawn a prior will, constituting him the sole beneficiary, her actions in the will offered for probate indicate a consistent pattern to favor Willie and his family, and in view of her prior will naming him as her sole beneficiary, there is nothing unusual in the terms of the present will.

*By the Court.*—Judgment affirmed.