Estate of Maxcy: Florida Synod of the Presbyterian Church, U. S. A., and another, Appellants, vs. Nicholls and others, Respondents.

*January 9—February 6, 1951.*

For the appellant Florida Synod of the Presbyterian Church, U. S. A., there were briefs by *Bender, Trump & McIntyre,* attorneys, and *Walter H. Bender* and *Kneeland A. Godfrey* of counsel, all of Milwaukee, and oral argument by *Mr. Godfrey* and *Mr. Walter H. Bender,* and by *Mr. Edwin M. Wilkie* of Madison.

For the respondents there was a brief by *Roberts, Roe, Boardman, Suhr & Bjork* of Madison, and oral argument by *Glenn D. Roberts* and *W. Wade Boardman.*

GEHL, J.  The rule to be applied in the determination of the ultimate issue in this case is stated in *Will of Faulks* (1945), 246 Wis. 319, 361, 17 N. W. (2d) 423:

"The ultimate facts necessary to be proven in order to establish undue influence have been frequently stated. We shall state them briefly without comment or citation of authority as it facilitates the discussion of the issues. (1) A person unquestionably subject to undue influence. (2) Opportunity to exercise such influence and effect the wrongful purpose. (3) A disposition to influence unduly for the purpose of procuring improper favor. (4) A result clearly appearing to be the effect of the supposed influence."

The trial judge found that each of the elements had been established and that the execution of the will of April 2, 1949, was procured by undue influence exercised upon the testatrix by Clara C. Jensen. The findings must be sustained unless they are against the great weight and clear preponderance of the evidence. *Will of Schaefer* (1932), 207 Wis. 404, 241 N. W. 382.

(1) Was Mrs. Maxcy unquestionably subject to undue influence? She was eighty-four years of age, in very poor health during the period immediately preceding execution of the will, was entirely dependent upon Mrs. Jensen for her care and wants, and was failing both physically and mentally. Mrs. Sawtelle, a neighbor who had done considerable secretarial work for her, testified that after Mrs. Maxcy returned to her home from the hospital in October, 1948, she was never able to carry on an intelligent, coherent conversation; while at her home in Oshkosh there were occasions when she thought she was in Florida, and that she had difficulty comprehending the mail sent to her.

Kathryn Angevine, who had served as a practical nurse in attendance upon Mrs. Maxcy, testified that during the same period she was feeble and was dependent upon others for her care; she became gradually more childish; there were times when she thought she was elsewhere; she needed help in her conversation; and there were times when she was unaware that the witness was with her. To about the same effect was the testimony of J. B. Cardiff who had been a neighbor. The testimony of Hugh Shields, who had been employed by the deceased and her husband since 1925, was similar. He added that there were times when she did not recognize him and that upon one occasion after she returned from the hospital in addressing him she called him "Mr. Maxcy." Mrs. Maxcy resented the fact that her two nieces had made application for the appointment of a guardian. That such resentment, particularly because of the manner in which it was discussed with her by Mrs. Jensen, made her susceptible to influence on April 2d appears from the testimony of several witnesses.

The testimony of the physicians called by contestants clearly discloses that she was subject to undue influence. Dr. Ebert, who treated her at the hospital in September, 1948, testified that at that time she was confused and that while

he was treating her she imagined that he was attempting to kill her. Dr. Williams treated her from the time she entered the hospital until May 21, 1949. He testified that from January 1st she failed both mentally and physically. She gave "silly" answers to simple questions; she was a very sick person, and imagined that a pill which the witness gave her would cure her and enable her to go to Florida. Dr. Byron J. Hughes, a specialist in psychiatry and superintendent of the Winnebago State Hospital, examined her on April 6, 1949, four days after the date of the will in question, in connection with the application which had been made for the appointment of a guardian. He found hypertension to a high degree. He testified that in response to his question as to her age she answered that she was fifty years old; later that she was one hundred years old. She stated that the rentals from her real estate amounted to $200 per month. She was afraid to take medicine for fear something would happen to her if she did; that her memory was definitely faulty; she could not tell him the name of the manager of her Florida property; and gave it as his opinion that she was at the mercy of her environment, at such a mental level that she was actually at the mercy of her environment; that she did not have sufficient judgment to differentiate things that would come to her; and that she was in that mental condition both on April 6th when he examined her, and on April 2d when the will was executed.

We have no difficulty determining that there is ample support for the court's conclusion that Mrs. Maxcy was subject to undue influence.

(2) Was there opportunity for Mrs. Jensen to exercise undue influence and effect a wrongful purpose?

There is little question as to that. From March 22d to April 2d Mrs. Maxcy was under her care; she was feeble and relied almost entirely upon Mrs. Jensen for her care and physical needs. Few people other than the Jensens saw the

deceased during that period, and there is testimony which warrants the conclusion that only those whom Mrs. Jensen chose were permitted to see and talk to her. It is clear that there was opportunity. *Will of Schaefer, supra.*

(3) Was there a disposition on the part of Mrs. Jensen to influence unduly for the purpose of procuring improper favor? Evidence of such disposition appeared rather promptly after the Jensens entered the home. Immediately thereafter, Mrs. Jensen engaged in an argument with her predecessor attendant and told her to leave. An indication that Mrs. Jensen sought to make as much as possible of the fact that the nieces had made application for the appointment of a guardian appears from the testimony of Mrs. Sawtelle that on March 30, 1949, she called upon Mrs. Maxcy and that in the latter's presence Mrs. Jensen stated that it was perfectly terrible to have a guardian appointed; that all her properties would be taken from her, and that a guardian would be standing back of her telling her everything she had to do.

Shields testified that on four occasions he tried to see the deceased but was prevented by Mrs. Jensen, and that on two of these occasions he heard Mrs. Maxcy calling for him. Dr. Williams testified that when he called upon Mrs. Maxcy in 1949, Mrs. Jensen usually prompted the answers to the questions put to Mrs. Maxcy by the doctor. Viola Klotzbuecher testified that when she came to the home to witness the execution of the will she and the other witness were admitted by Mrs. Jensen and told by her to remain downstairs. Mrs. Maxcy was on an upper floor. After the application for the appointment of a guardian was made Judge McDonald called to see Mrs. Maxcy. Mrs. Jensen refused to let him in to see her. At the suggestion of Shields, Judge McDonald entered the house through a rear door and, with Shields, went to the room occupied by Mrs. Maxcy. When Shields pounded on the door a voice from within, thought by Shields to be that of Mrs. Jensen, answered, "Mrs. Maxcy doesn't

want to see you." Judge McDonald left without having seen Mrs. Maxcy. When he arrived at his home Mrs. Maxcy called him on the telephone and asked him to return. He returned, visited with the deceased in the presence of Mrs. Jensen who attempted to answer for Mrs. Maxcy the questions put by him.

Apparently, even after the making of the will, Mrs. Jensen continued the practice of interfering with visits made by others to Mrs. Maxcy. Dr. Hughes testified that while he was examining Mrs. Maxcy on April 6th Mrs. Jensen was in the room at all times, and that she interrupted to correct a number of answers made to questions put by the doctor. The doctor asked her to discontinue but she refused. Although Mrs. Jensen occupied a chair to the rear of the doctor, by means of a mirror on the wall he was able to observe that Mrs. Jensen nodded her head or made similar movements with her hand to suggest answers put by him.

Upon cross-examination Mrs. Jensen admitted that she was present during all of the visit of Dr. Hughes and that she was asked by him to discontinue answering or helping Mrs. Maxcy answer his questions.

The attorney who prepared the will had not acted previously for Mrs. Maxcy. He came to the home for the purpose of preparing the will at the suggestion of Mrs. Jensen for whom he had previously done some little legal work.

The will closes with this rather significant precautionary provision which was inserted without any express direction therefor from Mrs. Maxcy:

"I do hereby declare that, although physically handicapped at the present time, my mind is absolutely clear. I know what property I own. I know who my relatives and friends are. I know I am surrounded by some people who are more interested in my property than my physical well-being. I feel I have the right to dispose of my property at I see fit, in accordance with my own conscience. I have executed this will without any suggestions or influences of anyone."

A disposition on the part of Mrs. Jensen to influence appears rather clearly.

(4) Does the result appear to be the effect of the influence?

Mrs. Jensen from the time that she entered the Maxcy home received a regular salary. Previous to that time there had been no intimate relationship between them. On the contrary, they had had some dispute with respect to an oral contract by the terms of which Mrs. Jensen claimed Mrs. Maxcy had agreed to sell Mrs. Jensen and her husband one of her farms. In an effort to collect damages for Mrs. Maxcy's failure to perform she consulted with an attorney.

It is to be observed that Mrs. Jensen had taken care of Mrs. Maxcy only ten days before the will was executed and by the terms of the will she and her husband were given $10,000 and their son, whom Mrs. Maxcy had never seen, was given an additional $5,000.

The only church with which Mrs. Maxcy had ever been connected was the Congregational Church of Oshkosh. Mrs. Jensen had participated actively in the affairs of the Presbyterian Church of that city. Long before her death Mrs. Maxcy had made an effort to sell her stock in the Florida hotel. Mrs. Maxcy's only close relatives were the two nieces who had been named residuary legatees in previous wills and to whom, according to Mrs. Sawtelle, she wanted all of her property to go, inasmuch as the original fortune had come from her side of the family.

Hugh Shields testified that after the Jensens arrived at the home he saw Mrs. Maxcy alone a few times and that she said that she didn't like the Jensens and that all they wanted was what they could get out of her.

It may appear strange that if Mrs. Jensen sought to influence Mrs. Maxcy so as to benefit by the terms of the will she and her family would have acquired only $15,000, two and one-half per cent, of her estate. The answer to that

probably is, (1) that to the Jensens $15,000 seemed considerable money, (2) that she may have thought that it was prudent to provide for her and her family a relatively small amount of money and thereby make it appear less obvious that she had influenced Mrs. Maxcy, and (3) she may not have known the size of the estate. The result clearly appears.

It would unnecessarily lengthen this opinion to recite the circumstances further. Many of them and others appearing in the record are controverted by the testimony of the proponents, but we conclude that the question was one of fact for the trial judge. *Will of Russell* (1950), 257 Wis. 510, 44 N. W. (2d) 231. We regard those here referred to and others appearing in the record as sufficient to sustain the judge's findings.

Proponents contend that if the finding of undue influence on the part of Mrs. Jensen should be upheld such determination does not void the entire will of April 2d, but invalidates only the specific bequest to her. The objections to probate were to the entire will and the court found it to be void in its entirety. In one of the findings it is recited:

"That the said Isabel T. Maxcy would not have changed her general plan of distribution of her estate as evidenced in her last-preceding testament but for the undue influence of Clara C. Jensen, and the instrument of April 2, 1949, does not express the testamentary desires of said decedent."

This finding establishes clearly that the court considered that the entire document, all of its contents, resulted from the influence exercised by Mrs. Jensen.

Further evidence of the trial judge's conclusion that the entire will was the result of the influence of Mrs. Jensen is found in his memorandum opinion:

"I believe that Wisconsin has never accepted the separation of clauses in a will executed after the exercise of undue influence and I do not believe that if Wisconsin does accept it, it should be an element in this case. I do not believe, that

Mrs. Maxcy, in the full control of her mental faculties, and not under fraudulent advice and influence of an outsider, would have ever changed her general plan of disposition of her estate, and I believe that the will of April 2, 1949, must be denied probate. In fact, viewing the testimony in the whole, I believe it is quite clear that the will of April 2d was not Mrs. Maxcy's plan, her wishes, or her will."

Proponents cite a number of authorities in support of their contention that partial invalidity may be declared. These cases treat the matter as presenting an issue of fact—how far did the influence of the offender extend? We consider that there was ample testimony to support the trial court's determination that the entire will was the result of Mrs. Jensen's conduct. Pointing to that fact are, among other things, the significant undisputed circumstances that the two nieces with whom testatrix had previously been most friendly were cut off entirely; that Mr. and Mrs. Jensen with whom Mrs. Maxcy had recently had a dispute regarding performance of an alleged contract and who had served her only about ten days, were given $10,000; that their son, whom Mrs. Maxcy had never seen, was given $5,000; that a religious sect with which she had never been associated was given the bulk of her estate; that Mrs. Jensen had been active in the affairs of that sect, her son one of its ministers; that the pattern of the will is an almost complete departure from her previously and relatively recently expressed plan of disposition. We find no reason to disturb the conclusion of the court on the issue of partial invalidity.

Proponents question the trial judge's ruling permitting Hugh Shields to testify as to transactions and conversations with the decedent. He was named as a beneficiary in each of the wills; under the will of April 2d he is bequeathed $5,000, under the codicil to that of October 30, 1948, $15,000. Counsel do not assign this error as a basis for a new trial, but contend that it detracts from the testimony

upon which the court found undue influence. We consider that disregarding the testimony of Shields, there is still enough in the record to support the conclusion that undue influence was exercised by Mrs. Jensen.

The same is true with respect to proponent's attack upon the conduct of Judge McDonald and the fact that he was permitted to testify. They call attention to his visit to the home of the decedent and his testimony as to his conversation with her while the application for the appointment of a guardian was pending in his court; also that his testimony was received in violation of sec. 325.29, Stats., which prohibits a judge from testifying as to any matter of opinion in a proceeding in which any person related to him in the first degree shall be an attorney of record. His son, Franklin McDonald, was attorney for the special administratrix of the estate. We refrain from any discussion regarding the propriety of the act of the judge. We consider that if it was improperly received there is, aside from his testimony, sufficient to sustain the trial judge's conclusion.

Counsel refer to several of the remarks of the trial judge as indicating bias on his part, and to the fact that it must have been difficult for him to render an unbiased decision in this case where a fellow member of the judiciary has taken a rather keen and active part. It is true that near the close of the trial the judge made some remarks evidencing a degree of impatience, but we assume that counsel is cognizant of the fact, as we are, that impatience is quite likely to appear upon occasion and particularly during a trial consuming as much time as did this. We do not find anything in the record, however, which indicates that the judge was influenced by bias or by the fact that a brother county judge participated as a witness upon the trial.

*By the Court.*—Judgment affirmed.

HUGHES, J., took no part.