WILL OF HOPKINS: HOPKINS, Contestant, Appellant, vs. RAIHLE, Executrix, Proponent, Respondent.

*October 9—November 7, 1956.*

634

For the appellant there were briefs by *Stafford, Pfiffner & Stafford* of Chippewa Falls, and oral argument by *Harold E. Stafford.*

For the respondent there was a brief by *Paul H. Raihle, Marshall Norseng,* and *Henry Christoffersen,* guardian *ad litem,* all of Chippewa Falls, and oral argument by *Mr. Norseng* and *Mr. Christoffersen.*

FAIRCHILD, C. J.  The first contention of the appellant is that the testator, at the time he executed his will on July 19, 1954, lacked testamentary capacity. To support this contention appellant introduced a large number of witnesses who testified as to various incidents concerning testator's habits and characteristics. Much of the testimony was repetitious, the witnesses repeatedly stressing the change in gait and physical vigor of the testator in his later years and saying that he was not as keen as he used to be. Some of the occurrences testified to took place after the execution of the will and are therefore not relevant. There was medical testimony, on a hypothetical basis, by doctors who had never seen the testator until just before his death. This and other testimony was admitted over objection, and the trial court in his decision said: "A large portion of such evidence is properly objectionable."

The sum and substance of appellant's lengthy presentation of circumstantial evidence is that the testator was not as vigorous as he once was, and that his actions were such as are commonly recognized to accompany advancing age resulting from a less acute reaction of the mental and physical faculties. There was no showing of hallucinations, and none of the witnesses on direct examination was willing to state that James Hopkins, in 1954, was "crazy." His own brother, appellant here, who would receive a share in the testator's estate should the will fail, testified on direct examination:

"I couldn't tell much about Jim Hopkins failing mentally over the last couple of years or longer. He's a very closed

mouth fellow, never gossiped or talked hardly at all, only in the line of duty, he failed a lot physically, he seemed to get smaller. I'm that way myself now. His stride, his walking gait got slow. He got a lot slower than he was in his prime. He stiffened up, maybe had rheumatism, never complained of it. His steps or stride was shorter, knees could be weaker. I wouldn't know whether during the last several years he did odd things that were unusual. In farming, a lot of odd things being done all the time among the farmers."

The same witness also testified that "during the time, years of 1953 and 1954 and up into 1955 until the time he went to the hospital he was actively engaged in the farming of those two farms." The overwhelming evidence is that James Hopkins, until the time he was taken to the hospital, managed and carried on the operation of two farms comprising 680 acres; that at his death he had a large herd of cattle, good corn, and machinery that was in good condition, "practically new."

There is convincing evidence that the deceased was mentally competent in July, 1954, in the testimony of his banker. On July 26, 1954, shortly after the execution of the will involved here, testator went to the Northwestern State Bank at Chippewa Falls to make a loan. The loan was negotiated between him and R. P. Bartz, who informed him that the amount of the loan asked for would require a financial statement. Without being previously informed of such requirement, the testator was able to make a satisfactory statement from memory. Mr. Bartz testified:

"He did not use any notes or anything to refresh his recollection at that time about his financial condition. He sat right at my desk and gave me his financial statement. He gave me the information as I asked for it, for instance, I'd ask him how many head of stock he had, how many were milking cows, how many were beef cows, how many head of young stock he might have, what his machinery consisted of, and the value of each individual item. . . . I was under the impression that he had a clear perception of the extent of his

property, that is in regard to his mental condition. We made the loan."

The loan was paid off early in 1955. It appears that testator was competently handling his own affairs at that time.

We have made a careful reading of all of the testimony and are mindful of all the circumstantial evidence presented by appellant and received by the trial court, whether objected to or not, and we agree with the trial court that the "proof required . . . that the deceased lacked testamentary capacity falls far short of that required by law." The overwhelming evidence is that the testator, at the time of making his will, knew the extent of his property and what it consisted of. He knew who his relatives were and what his relation to them was.

The second contention of appellant is that the will was not properly executed. The scrivener, Paul H. Raihle, his wife, two subscribing witnesses, employees of the testator at the time, and the testator were present at the execution of the will. The scrivener and the subscribing witnesses testified on direct examination that the witnesses signed the will in the presence of the testator and in the presence of each other. John Malar, one of the subscribing witnesses, testified on direct examination that he was called in by the testator, and that he (Malar) then went to call the other witness, Lester Schimmel. Both testified that they knew they were signing Mr. Hopkins' will, and the scrivener testified that he specifically explained to them what they were doing. The execution of the will was, therefore, in compliance with the statutory requirement of sec. 238.06, Stats. Appellant complains that the court committed prejudicial error because it refused to receive as exhibits certain signed statements of the two subscribing witnesses to the will, to the effect that they did not know they were signing a will, and that the testator signed after they did. However, we point to the fact that, over

objection of respondent, the court did allow appellant's counsel to read from those statements at length and cross-examine the two witnesses without limitation, and that that testimony became a part of the record. The trial court heard the evidence and had an opportunity to observe the witnesses. No prejudicial error was committed by the exclusion of the exhibits. The court, basing its finding upon the direct and material evidence, properly found that the will had been executed in compliance with sec. 238.06.

The third contention of appellant is that the testator was subjected to undue influence by Sylvia and Paul H. Raihle. The Raihles were friends of both the testator and his wife for a long period of years, and Mr. Raihle had been testator's attorney for almost thirty years. The Raihles were not beneficiaries under the will and had no pecuniary interest in the will. The only circumstance presented in appellant's argument of undue influence is that Mrs. Raihle, shortly before the execution of the will, suggested to both the testator and his mentally deficient stepson, Jack Dodson, that it might be a good thing for Jack to attend a summer camp for the mentally retarded. This suggestion was rejected by both testator and stepson. Jack Dodson did not attend the camp, and testator showed no susceptibility of being influenced by Mrs. Raihle's suggestion. Mrs. Raihle was an assembly-woman, representing Chippewa county in the Wisconsin legislature; she was chairman of the public welfare committee. She showed a proper interest in the welfare of Jack Dodson, not undue influence on James Hopkins in the matter of his will. Of the first three requirements to substantiate undue influence—susceptibility by the testator; disposition on the part of the person charged with undue influence; and opportunity to exercise such influence—the only showing which can be said to have been made by appellant is that of opportunity. And of the fourth requirement, that the undue influence was successful, there is a total lack of proof.

Appellant claims that the will was an unnatural will, because after the administration of the specific bequests, the bulk of which was to the Masons, no residue remained to distribute to the surviving relatives. When a valid last will and testament has disposed of the owner's estate, the interest of surviving relatives is controlled by its provisions and not by the statute of descent. As said by the trial court, "the law gives the testator the right to dispose of his property in any manner he may desire as long as it is his own act and free will, and the court is fully satisfied in this instance that the testator knew what he was doing at the time he signed his will and disposed of his property in the manner indicated therein . . . it is the responsibility of this court to so respect his wishes."

As to the contention that, with the appointment of Judge BARRETT, Judge LARRABEE lost jurisdiction of the case and therefore was not qualified to cancel that appointment and make another. The second appointment, i. e., the appointment of Judge STERLINSKI, was made before Judge BARRETT had assumed jurisdiction in fact, because Judge BARRETT had decided not to act. There can be no question about the jurisdiction of the county court of the subject matter, nor can there be any doubt but that appellant's appearance in the court was a general appearance in the proceedings. Indeed, not only did he fail to raise objection to the assumption of jurisdiction by Judge STERLINSKI, but there were proceedings initiated by him after the assumption of jurisdiction by Judge STERLINSKI, calling upon the judge to act. He procured an order appointing a special administrator and conducted other proceedings. Text writers and decisions of courts recognize the rule that the general appearance is a general waiver of objection to jurisdiction to adjudicate concerning the cause. The appellant, under the existing circumstances, can raise no objection to the jurisdiction of the court, and therefore waived all objections to the power of

Judge STERLINSKI to act. *Estate of Williams,* 266 Wis. 403, 63 N. W. (2d) 736; *Case v. Hoffman,* 100 Wis. 314, 356, 72 N. W. 390, 74 N. W. 220, 75 N. W. 945; *Estate of Hill,* 272 Wis. 197, 211, 75 N. W. (2d) 582; 14 Am. Jur., Courts, pp. 380, 386, secs. 184, 192.

*By the Court.*—Judgment affirmed.