ESTATE OF BEALE: RISSER, Guardian *ad litem,* Appellant, v. BEALE, Executrix, and others, Respondents.*

*January 11—February 6, 1962.*

* Motion for rehearing denied, with $25 costs, on April 3, 1962.

550

For the appellant there were briefs by *Fred E. Risser*, and oral argument by *Fred E. Risser* and *Fred A. Risser*, both of Madison.

For the respondent Georgia Robison Beale, executrix, there was a brief by *Rieser, Stafford, Rosenbaum & Smith* of Madison, attorneys, and *Harry B. Rosenberg* of Chicago, Illinois, of counsel, and oral argument by *Mr. William Rosenbaum* and *Mr. Rosenberg*.

For the respondents Henry Barton Robison Beale and Howard Kennedy Beale, Jr., there was a brief and oral argument by *Laurence W. Hall* of Madison, guardian *ad litem*.

BROWN, J.

### *Is This An Unnatural Will?*

Appellant begins with the assertion that the 1959 will is an unnatural one in that it disinherited Beale's ten-year-old son. Then he states his proposition that "proponents of an unnatural will have burden to give a reasonable explanation for its unnatural provisions." The learned trial court filed a written decision which demonstrated the meticulous study which the court gave to the will itself and to the evidence adduced in the several hearings, and the court concluded

that the will was not "unnatural." Thomas' inheritance was reduced by the 1959 will to a contingent remainder but whether this rendered the will an unnatural one seems to us to be immaterial in the absence of any contention by appellant that, because of testamentary incapacity, undue influence, or other factors appearing in the evidence, the will does not express the testator's true desires and intent. There are present no such factors to impugn the conclusion that the 1959 will exactly stated Professor Beale's own wish and purpose in respect to provision for his son Thomas. As the provisions or the lack of them are within the permission of the law neither Beale nor anyone else has to justify them or please any other person.

Appellant's brief further informs us that "the right to make a will is not a constitutional or natural right, but a 'creature of statutory law,' " citing a Pennsylvania case. We have frequently held to the contrary, even so recently as in *Estate of Ogg* (1952), 262 Wis. 181, 54 N. W. (2d) 175, and *Will of Wright* (1961), 12 Wis. (2d) 375, 107 N. W. (2d) 146. See also *Will of Rice* (1912), 150 Wis. 401, 450, 136 N. W. 956, 137 N. W. 778. In each of those cases we have emphasized that the right to make a will is a sacred and constitutional right, which right includes a right of equal dignity to have the will carried out. And see *Will of Hopkins* (1956), 273 Wis. 632, 639, 79 N. W. (2d) 131, where we said:

"Appellant claims that the will was an unnatural will, because after the administration of the specific bequests, the bulk of which was to the Masons, no residue remained to distribute to the surviving relatives. When a valid last will and testament has disposed of the owner's estate, the interest of surviving relatives is controlled by its provisions and not by the statute of descent. As said by the trial court, 'the law gives the testator the right to dispose of his property in any manner he may desire as long as it is his own act and free will, and the court is fully satisfied in this instance that the

testator knew what he was doing at the time he signed his will and disposed of his property in the manner indicated therein . . . it is the responsibility of this court to so respect his wishes.' "

In the *Rice Case, supra,* at page 446, we cited with approval *Will of Dardis* (1908), 135 Wis. 457, 115 N. W. 332, to the effect that ". . . regardless of holdings elsewhere, in this state, a will, once validly made and subsisting to the death of the testator, must be taken and judicially enforced according to his intent, if that can be ascertained; . . ."

The long line of Wisconsin decisions does not permit the probate court to entertain the argument that a will can be denied probate only because it appears to be unjust to a natural object of a testator's bounty. Here appellant has made no attack on the testamentary capacity of Beale nor has he claimed he was unduly influenced. *Will of Dobson* (1951), 258 Wis. 587, 588, 46 N. W. (2d) 758, states the following, relying upon *Will of Schaefer* (1932), 207 Wis. 404, 241 N. W. 382:

"We might, without great difficulty, conclude that in equity the instrument provides an unjust distribution of the estate. However, we may not consider it in the light of what we may deem just or unjust. If it was made by Joseph Dobson with full testamentary capacity, expresses his desires, and is not the result of undue influence, it is our duty to give it effect. That it does not divide the estate equally between the natural objects of testator's bounty is not controlling."

Thus this court, as well as the county court, is precluded from considering whether Professor Beale's 1959 will is an "unnatural will," with a view to denying probate to it.

### Execution of Will.

While appellant concedes, or at least does not dispute, that when Professor Beale signed the purported 1959 will

he had testamentary capacity and was not subject to undue influence, appellant vigorously denies that the 14 pages of the 1959 instrument were legally published and declared to be his will and legally signed and witnessed as such and, in the alternative, that these pages did not constitute his will at the moment of execution.

In this record there are a few indisputable facts. From them there are a number of conflicting inferences reasonably to be drawn.

It cannot be questioned that on June 16 or 17, 1959, Professor Beale dictated a 14-page document in the form of a last will, revoking all prior wills; that his secretary typed the original will, with three carbon copies, and delivered all of them to him in loose-leaf form the afternoon of June 20th; that Beale was in New York City at the home of a friend, a professor at Columbia University, on the evening of June 21st and on that evening he exhibited "a pile" of sheets of paper and declared to his three friends that this was his will and desired them to witness his will; that they saw him sign the sheet which was on top of the pile and that immediately thereafter, at his request, they signed as witnesses in his presence and in the presence of each other; that the place where they put their signatures was immediately below the usual testamentary clause declaring this to be Professor Beale's will; that none of the witnesses paid any detailed attention to the number of pages in the pile nor could they identify later any of the pages except the one where they had written their names; that when all four participants had signed, Beale put all papers in his briefcase and the meeting ended.

It is uncontradicted that on the next day, or shortly thereafter, Beale and his two sons left by plane for Moscow; that a few days after June 21st, Mrs. Burleigh, Beale's secretary, received a letter from him on Columbia University notepaper, bearing date June 21, 1959, mailed in New York or

in London on a day not given; that the letter asked Mrs. Burleigh to make several changes in pages 12 and 13 of the will which she had previously typed, to carry out marginal penciled notes in Beale's handwriting on those pages; that inclosed with the letter were the original pages 12 and 13; that Mrs. Burleigh made the alterations as directed and mailed them back to him in Moscow; that these pages were later found in a sealed envelope addressed to Beale in Beale's handwriting and mailed from London, England, to him at his Madison address.

There is nothing legally invalid in the execution of a will because the separate pages of the will have not been fastened together. It is a requirement, though, that all the pages be present at the time of execution.

Thompson, Wills (3d ed.), p. 197, sec. 124, states:

"It is not necessary that they [the witnesses] see or examine all the pages of the will to see that all the sheets of paper were in place when the will was executed." Citing *In re Sleeper's Appeal* (1930), 129 Me. 194, 151 Atl. 150, 71 A. L. R. 518.

In *In re Sleeper's Appeal, supra* (p. 205), the court stated:

". . . nor is it essential that the witnesses should see and examine all the pages of a will at the time of execution, if the court is satisfied from other evidence or the circumstances surrounding the execution, that all the sheets of paper offered for probate were present at the time of execution."

2 Page, Wills (Bowe-Parker rev.), p. 277, sec. 19.147, is to the same effect, citing *In re Sleeper's Appeal, supra,* and 11 Boston University Law Review, 148; 5 Temple Law Quarterly, 152; 17 Virginia Law Review, 69; and 40 Yale Law Journal, 144.

In the case at bar the witnesses are unable to say whether or not the 14 pages were on the table before them when, on

June 21st, they signed the last page. The determination then, comes down to the reasonable inferences to be drawn from the established facts. Appellant relies on the undisputed fact that two pages of the will were received in Madison within a few days following June 21st, inclosed in a letter dated June 21st. And appellant infers that those two pages had already been sent off to Madison when, late in the evening of June 21st, the testator and witnesses signed the last page.

On the other hand, the trial court put weight on the fact that all 14 original pages are clearly identified and legible as they were dictated by Beale before the corrections or amendments. This intact original was handed to Beale by his secretary and was taken by him to New York. The very next day Beale presented "a pile" of papers to his witnesses and declared that such papers were his will. It is not impossible or improbable that Beale was speaking the truth and the pile of pages were the complete 14-page will, as the trial court found. The fact that Beale sent off two pages to Mrs. Burleigh with a letter dated June 21st may raise an inference that Beale did this before he went to the party and he had there only the remaining pages, which he falsely declared to be his will. Certainly that is not the only permissible inference. When Beale and his friends had signed the will and he had gathered up the pages and departed, June 21st was not over; Beale could still have written the letter, less than 100 words, on that date after the party and inclosed with it pages 12 and 13. There is no evidence at all of when the letter and the pages were mailed and there is some evidence that they were mailed in London.

The question is one of inference and when the inferences can reasonably go either way the appellate court must adopt the view taken by the trial court.

"1. It is the function of the trial court, in cases tried to the court, to draw such inferences from the established facts as deemed proper, and the supreme court cannot disturb the

same unless they are against the great weight and clear preponderance of the evidence." *Hull v. Pfister & Vogel Leather Co.* (1940), 235 Wis. 653, 294 N. W. 18 (headnote).

"As the trial court's function is to determine the facts and to weigh them, *Will of Russell* (1950), 257 Wis. 510, 44 N. W. (2d) 231, so, too, the inferences to be drawn from established facts are for the trier of the fact, in this case the trial court. Its findings in these respects should not be interfered with unless contrary to the great weight and clear preponderance of the evidence, . . ." *Estate of Miller* (1953), 265 Wis. 420, 424, 61 N. W. (2d) 813.

"It is well established that findings of a trial court are not to be disturbed on appeal unless they are contrary to the great weight and clear preponderance of the evidence. *Swazee v. Lee* (1951), 259 Wis. 136, 137, 47 N. W. (2d) 733." *Drott Tractor Co. v. Kehrein* (1957), 275 Wis. 320, 323, 81 N. W. (2d) 500.

"The most that can be said is that on some of the contested issues of fact, the proof might have sustained a finding contrary to that made by the court. Upon such a state of the record this court may not disturb the findings of the trial court." *Drott Tractor Co. v. Kehrein, supra,* page 328.

While the present facts permit the inference urged by appellant they do not compel that inference in opposition to the one drawn by the trial court, and the evidence and reasonable inferences sustain the trial court's conclusion that the entire original will, as dictated by Professor Beale to his secretary, was before the witnesses and the execution of that will complied with the requirements of law.

### *Animus Testandi.*

Appellant, however, has other shots in his locker, the first of which is that even if the entire 14 pages of the will, as originally typed, were before the testator and witnesses at the time of execution, the fact that Beale so quickly chose to

make changes in it must persuade the court that at the moment of execution Beale did not intend this to be his will, no matter what he may have declared. The burden is on appellant to show that although Beale had himself dictated this will in the very recent past and had declared it to his three friends to be his will, he had already changed his mind concerning it.

As before, the court might have drawn that inference but it was not compelled to do so. The trial court considered Beale's express declaration that this was his will as of that moment was entitled to the greater weight. That court said, in its written decision:

"The objectors contend that the proper *animus testandi* is lacking in this case. Such an objection cannot be sustained. It certainly cannot be said that a man who dictates a document consisting of 14 pages which purports to be his last will and testament, takes the finished typewritten document from Madison, Wisconsin, to New York City, secures three personal friends to witness the document, telling them it is his will, all of which takes place shortly before he is to take a long trip to a foreign land, lacks the necessary testamentary intent to make that document his last will. The necessary testamentary intent existed at the time the will was executed, and that is all that is required."

The inference drawn by the trial court is reasonable and we must adopt its conclusion.

### Revocation.

Next, appellant submits that Beale had revoked the 1959 will. Sec. 238.14, Stats. 1959, states:

"WILLS, HOW REVOKED. No will nor any part thereof shall be revoked unless by burning, tearing, canceling, or obliterating the same, with the intention of revoking it, by the testator or by some person in his presence and by his direction, or by some other will or codicil in writing, executed as prescribed in this chapter, or by some other writing,

signed, attested, and subscribed in the manner provided in this chapter for the execution of a will; excepting only that nothing contained in this section shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator. The power to make a will implies the power to revoke the same."

These are the only ways by which a will can be revoked in this state. *Deck v. Deck* (1900), 106 Wis. 470, 82 N. W. 293. The burden is upon the objectors to establish by competent evidence that there was a valid and effective revocation. *Estate of Sweeney* (1946), 248 Wis. 607, 22 N. W. (2d) 657, 24 N. W. (2d) 406.

In contending that Beale intended to revoke the 1959 will, appellant first points to the several alterations requested by Beale and the fact that the date was changed from June 21st to June 22d. Beale, himself, never said or wrote that he intended to revoke the will. He wrote a direction to modify one sentence. Such attempted alterations, according to appellant, were themselves sufficient to revoke the 1959 will. None of these alterations pertained to the distribution of Beale's property. As already mentioned, the change in executors was the only significant substitution. Such a change does not operate as a revocation of the will in its entirety. 57 Am. Jur., Wills, p. 355, sec. 510, states:

"Clearly, a will is not revoked in its entirety by the act of the testator in striking out the name of the person designated executor and writing in the name of another person as executor, notwithstanding this occurs after the will has been executed and attested and without a reattestation or republication."

Respondents contend that the substitution of executors, as it did not comply with statutory will standards (sec. 238.06, Stats.), is invalid. Thus, the attempted changes cannot have the effect of invalidating the will. Even if the changes were

valid they would have no effect on the property distribution directed by the will. *Will of Home* (1939), 231 Wis. 227, 233, 284 N. W. 766, 285 N. W. 754, held: "Aside from this the alterations have no effect to invalidate the will as a whole. They would only invalidate the change." In the same case we said, page 234: "The recent case of *Will of Byrne,* 223 Wis. 503, 271 N. W. 48, clearly implies that alterations in a will do not render it void and have no effect except as they operate as partial revocations."

2 Page, Wills (lifetime ed.), pp. 3, 4, sec. 537, says:

"If the will which is altered by testator after execution is one which is required, by statute, to be attested and subscribed by witnesses, interlineations which testator makes after execution, are of no effect unless the will is subsequently re-executed or republished; and such a will must be admitted to probate as though the interlineations had never been made. . . .

"If the name of an executor is added after execution, such addition is of no effect."

*Will of Marvin* (1920), 172 Wis. 457, 179 N. W. 508, (headnotes 1 and 2) states:

"If a testator cancels or destroys a will with the present intention of making a new disposition of his property, and the proposed new disposition fails to be carried into effect, the presumption in favor of a revocation by the canceling is repelled, and the will stands as originally made.

"Where testatrix left all her property to one of four grandchildren, and after her death the will was found to have pencil marks through the words bequeathing the property to such grandchild, and below the attestation clause there was written with a pen a clause in the handwriting of the testatrix giving all her property, after payment of all her debts, to an orphans' home, but such clause was not signed by testatrix nor witnessed, the attempted changes did not become effective and the will remained as originally drawn."

We determine that the 1959 will was not revoked by the alterations nor were the attempted modifications effective.

We then come to a fact whose effect, if any, until now we have found no occasion to consider, viz. :

Promptly after Professor Beale's death his family searched his office in the University library for a will. What they found there was the 1959 will, without the *first* page, and a complete copy of the will, including the first page. Several months later the missing original first page was discovered in a folder containing Beale's notes for a history lecture. These papers were found in Beale's second office in another University building. This page was delivered to the court and the complete will as originally transcribed and legible in spite of the alterations was then before the county court.

Page 1 contained the introductory clause revoking all prior wills. Appellant submits that the abstraction of this page from the remainder of the will manifested Beale's intent to destroy the will of which page 1 was a part. The trial court concluded that page 1 had merely been misplaced and no contrary intent has been proved. Once the execution and validity of a will has been established, valid and effective revocation is a burden which falls upon the objectors. *Estate of Sweeney, supra.* The county court's conclusion that appellant has not met this burden is consistent with the proof. A contrary view, that revocation by this means was intended, depends not even upon inference but on mere speculation.

## *Epilogue.*

At least one more mystery appears worth mentioning, although in our view it presents no fact to affect the outcome :

A few days before Christmas, 1959, Beale, who had returned to Madison, directed Mrs. Burleigh to retype the

altered pages 12 and 13 on the same typewriter she had used when she first typed the will. We may guess that Beale wanted pages which did not show they had been tampered with, as was apparent on the two original sheets now showing erasures and retyped corrections. We may guess, further, that Beale intended to insert in the will without discovery the new pages without republication and re-execution of the will. This is no more than guesswork and is of no consequence. Before Mrs. Burleigh typed the two new sheets Beale's death intervened on December 27, 1959. Whatever his purpose, nefarious or not, he did not accomplish it. Mrs. Burleigh had not begun this final typing when she was told that Professor Beale had died. She then typed the two pages as Professor Beale directed and gave them to Beale's son, Henry. There were then no marginal initials on them. These pages are in evidence and, although Professor Beale never in his life had them or saw them, his initials are now on the margin of each of these pages and, as Mrs. Burleigh testified, are in his handwriting.

We began with a consideration of the unnatural. At the end we are confronted by the supernatural. We consider ourselves fortunate that this weird addition to the facts turns out to be immaterial.

We conclude that the trial court's findings and conclusions are not against the great weight and the clear preponderance of the evidence and the judgment admitting the will to probate as the will existed when it was executed and as Mrs. Burleigh first typed it must be affirmed.

*By the Court.*—Judgment affirmed.

CURRIE, J. (*dissenting*). On the record here presented, the paramount issue is whether, at time of execution of the 1959 will, testator intended the then existing 14 typewritten pages to be his will. As the majority opinion intimates, if it was testator's intent to keep the instrument ambulatory in

character, so that from time to time he could substitute pages for any except the last, which bore the signature of himself and witnesses, then this instrument would not qualify as his last will and testament because the requisite testamentary intent would be lacking. The crucial piece of evidence on this issue is testator's letter of June 21, 1959, to Mrs. Burleigh forwarding for retyping the two pages on which he had made alterations. If this letter was written before testator and the witnesses affixed their signatures, it would carry great weight in establishing that testator had intended an ambulatory instrument.

The June 21st letter was written on Columbia University stationery. A reasonable inference is that he procured this stationery at the apartment of his friend, Professor Forcey, a member of the Columbia University faculty, and the host of the June 21st party given in honor of testator. However, Professor Forcey, who testified as a subscribing witness to the 1959 will, was asked no questions about furnishing stationery to testator or about whether he possessed any knowledge concerning the writing of the June 21st letter.

Forcey did testify that both Howard Kennedy Beale, Jr., and Henry Barton Beale were present with their father in the Forcey apartment at the June 21st party. Neither of these two sons of testator was called as a witness at the trial. The general rule is that failure of a party to call a material witness within his control, or whom it would be more natural for such party to call than the opposing party, raises an inference against such party. *Feldstein v. Harrington* (1958), 4 Wis. (2d) 380, 388, 90 N. W. (2d) 566; 2 Wigmore, Evidence (3d ed.), p. 162 *et seq.,* secs. 285, 286. This rule is applicable in situations of family relationship, such as parent and child. Anno. 5 A. L. R. (2d) 893, 934. Thus, the failure to call either of these two sons as a witness raised an inference against the proponents of the 1959 will. However, the trial court's memorandum opinion does not com-

ment upon the fact that these two older sons were not called to testify as to their knowledge with respect to the writing of the June 21st letter.

It may very well be that the guardians *ad litem* for all three sons interviewed the two older sons about the June 21st letter and found they possessed no knowledge or recollection with respect to their father's writing it. However, this is a situation where the trial court might very well have drawn the opposite inference from that which it did. Additional testimony with respect to the June 21st letter might have tipped the scales the other way. This is very important considering the fact that a ten-year-old boy, who is a ward of the court, has been virtually disinherited by his father's will.

Under these circumstances I would exercise our discretionary power under sec. 251.09, Stats., to reverse and remand for the purpose of taking the testimony of the two older boys with respect to the June 21st letter.

I am authorized to state that Mr. Justice DIETERICH joins in this dissenting opinion.

HALLOWS, J., also dissents.